[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13083

_____

TEDDY BEASLEY,

                                        Plaintiff-Appellant,

*versus*

O'REILLY AUTO PARTS,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Alabama
D.C. Docket No. 1:20-cv-00092-N

_____

Before LUCK, BRASHER, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Teddy Beasley is a deaf man who can understand only about 30% of verbal communication through lipreading. He communicates primarily through American Sign Language (ASL).

Beasley worked for O'Reilly Auto Parts (O'Reilly) as an inbound materials handler. He claims that the company discriminated against him in violation of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a), because it did not provide him with the reasonable accommodations that he requested for his disability. He alleges that he requested but did not receive an ASL interpreter for various meetings, training, and a company picnic. He also alleges that he asked for text messages summarizing nightly pre-shift meetings but did not receive them either.

The district court, acting by consent through a magistrate judge, granted O'Reilly's motion for summary judgment on Beasley's ADA claim. The court did so based on its conclusions that Beasley had failed to establish a genuine issue of material fact that the reasonable accommodations he requested related to his essential job functions, and that he had suffered an adverse employment action because of O'Reilly's failure to provide those accommodations.

Reviewing *de novo* and looking at the evidence in the light most favorable to Beasley, as we are required to do, *see Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019), we conclude that genuine issues of material fact do exist about whether two of

Beasley's requested accommodations relate to his essential job functions and whether the failure to provide those two accommodations led to an "adverse employment decision," *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1263 n.17 (11th Cir. 2007).

Here is what the evidence, viewed in the light most favorable to Beasley, shows.  First, he requested text message summaries of nightly pre-shift meetings, but those were not regularly sent to him, and the ones that he was sent were incomplete.  He eventually requested an ASL interpreter to discuss with management his exclusion from the nightly meetings, but none was provided.  The nightly meetings were mandatory and included safety information.

Second, O'Reilly failed to provide Beasley with an ASL interpreter to resolve a disputed disciplinary matter that arose after he missed some nights of work in July 2017.  Beasley maintained that his time off had been approved, and he requested an interpreter to help him resolve his dispute about that with the Human Resources Department.  He wasn't provided one, and he maintains that the discipline O'Reilly imposed on him as a result affected his attendance record, which in turn adversely affected his pay.

If Beasley's allegations turn out to be the actual facts, there was a violation of Title I of the ADA, and that means summary judgment against him was inappropriate.  *See generally Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996) ("[W]hat [are] considered to be the 'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the

facts at this stage of the proceeding for summary judgment pur-poses.").

## I.    BACKGROUND FACTS AND PROCEEDINGS

### A. Facts

Teddy Beasley, who is deaf, is proficient in ASL. He was hired at the O'Reilly Distribution Center in Saraland, Alabama in April 2016 as a part-time inbound materials handler. An interpreter was present for Beasley's first in-person interview. His next round of interviews was scheduled "last minute," and O'Reilly could not arrange for an interpreter to be there on short notice. Beasley was given the option of proceeding without one that day or reschedul-ing for later in the week. He proceeded without an interpreter, and he communicated with his interviewers through a combination of speaking, lip-reading and interpreting body language.

Beasley signed a form stating that he had been offered and had accepted the job and needed an accommodation to perform the essential functions of it. An HR representative then filled out O'Reilly's required "Reasonable Accommodation" request form for Beasley, stating that he may need an interpreter during the training process. Beasley had an interpreter present for his orien-tation and when he met with O'Reilly's management to discuss the accommodations he would need.[1]

---

[1] The Alabama Institute for the Deaf and Blind helped provide the interpreter.

During that meeting about reasonable accommodations, O'Reilly's management agreed that Beasley could request an interpreter going forward if he needed one. It also agreed that, unlike his co-workers, Beasley could keep his cell phone with him in the warehouse in case he needed it to facilitate any work-related communication. During orientation Beasley learned about safety measures and how to clock in and out, and he walked the grounds of the distribution center.

After being hired on April 18, 2016, Beasley missed his first night of work on April 21, 2016 because he overslept. As a result, he received a written Final Warning, placing him on probation for a year.[2] He did not receive any other discipline until after that one-year probationary period expired.

Beasley worked on O'Reilly's "replenishment team." That five-member team generally worked a shift from 1:00 a.m. to 5:00 a.m. Beasley's job was to restock inventory. He used a handheld scan gun that showed how much inventory he needed to place and where. All of Beasley's work assignments came from his supervisor, Miguel Adams.

---

[2] O'Reilly's policy is to designate any employee who misses two or more hours of work without calling in a "No Call No Show" and to issue him a "Final Warning." That is the most serious step in O'Reilly's progressive discipline scale, other than termination. The adjective "final" in the title implies there were other warnings before, but that is not necessarily the case, and it wasn't the case here. There is no evidence that O'Reilly's disciplinary policy was applied more harshly to Beasley than to any other employee who missed two or more hours of work without calling in.

Before their work began each night, the team members participated in a mandatory meeting that lasted from five to twenty minutes. During these meetings, Adams would discuss the tasks for the day, go over any concerns, and provide safety information. Adams' boss, the manager John McMenamin, testified that these nightly meetings were important for "team building" and for "disseminating information." He stressed that one of the most important purposes of the meetings was to provide safety information. This is how he put it: if an employee attended a pre-shift meeting and didn't hear something about safety, "then it was an incomplete meeting. And there was a failure there." Safety was not the only purpose of the meetings. The tasks to be completed during that night's shift, and "anything the team members need to know" were also discussed. McMenamin's testimony made it clear that the pre-shift meetings were required, and there was no way to condense into a couple of sentences all of the information that was discussed in them.

Because he is deaf, Beasley could not understand what was being said in those pre-shift meetings or participate in them. Instead, he just waited for them to end each night. After each pre-shift meeting, Beasley would meet separately with Adams in his office in an attempt to learn what had been said. Beasley testified that instead of conveying to him the substance of the discussions at the meeting, Adams would simply assign him his tasks for the shift, usually by writing a short note on a piece of paper.

21-13083               Opinion of the Court                    7

On November 29, 2017, Beasley asked Adams to start send-ing him text messages summarizing the nightly meetings, and Ad-ams agreed.  But Adams repeatedly failed to carry through with that.  Over the course of the next three months, Beasley texted Ad-ams four more times to complain about not receiving the text sum-maries of the meetings and to reiterate his request that Adams send them.  Sometimes Adams would not reply, and other times he would provide a short response to a question about what had hap-pened in the meeting, for example, stating that it was "super lite same []as yesterday" or that he had only made a few jokes in the meeting.  After one of Beasley's requests for text summaries, Ad-ams apologized for not sending them and said it wouldn't happen again.  But it did, repeatedly.[3]

---

[3] In the November 29 exchange, Beasley texted Adams: "I need you to start texting me any info or messages on this text cuz [sic] I'm always left out almost all conversation in all meetings…What was said today?"  Adams responded: "I will start texting u the info out the morning meeting."  The next day Adams texted Beasley: "Start up topics, Good job overall working together let's con-tinue to focus on that."

Two weeks later Beasley texted Adams: "And what was said at the meeting?"  But Beasley did not receive a response.  Two days after that Beasley again asked "what was said in the meeting."  Adams responded that he "just Crack [sic] a few joke [sic] in the meeting."

The next month Beasley texted Adams: "Again… no memo.. or any info if [sic] what been said in meeting.. what's going on migiel?"  Adams responded: "My bad teddy it will not happen again we are doing Coaching again…your productivity is at 98.96% fastest on the shift number 8 in all of inbound."

Beasley also testified that he requested from HR an interpreter to discuss his inability to participate in meetings, but O'Reilly did not provide him with one.

### 1.  The Disciplinary Warnings Beasley Received

During his time at O'Reilly, Beasley received disciplinary warnings for being absent or tardy.  The company has a progressive discipline system.  An "absence" occurs when a team member is scheduled to work and doesn't appear for his shift.  If a team member is absent or tardy, it counts as one "occurrence."  Approved vacation or personal time and absences that are paid from the team member's "annual sick pay award" don't count as occurrences.  But a team member can use the "sick pay" exception only three or four times a year, depending on his years of service.  If an "[a]bsence[] span[s] more than one scheduled day for the same reason," it still counts as one "occurrence."

If a team member receives two occurrences within a six-month period, he is issued a documented verbal warning.  Receiving two more occurrences within six months after a documented verbal warning results in a "Written Warning."  Receiving two more occurrences within six months after a written warning results in a "Final Warning."  And receiving two more occurrences within a year after a Final Warning results in termination.

---

And the month after that, Beasley texted Adams: "Miguel… here we go again.. what was said in the meeting?.... no access again and again…. again." Adams responded: "super lite same has [sic] yesterday."

And some behavior immediately results in a Final Warning, even if it is the team member's first "occurrence." Being a "No Call No Show" is an example. A team member is considered a "No Call No Show" and gets the "Final Warning" that stems from it if he misses more than two hours of his scheduled shift without contacting his supervisor.

Warnings are supposed to involve a conversation between the team member and his supervisor. An O'Reilly HR representative testified that it was an important part of the progressive discipline process for supervisors and team members to discuss any disciplinary warnings. That is why progressive discipline forms include a place for the supervisor to sign attesting that: "I have discussed this with the team member."

After his initial Final Warning for missing his first shift on April 21, 2016, *see supra* at 5, Beasley did not receive another disciplinary warning until more than a year later on August 7, 2017. That was when O'Reilly issued him a documented "[v]erbal [w]arning" for missing work from July 5 to July 14 and then missing work again on August 2.

During the beginning part of the July 2017 absence, for about the first four days, Beasley had been on a family trip to Orlando for his daughter's dance competition. At his orientation in April 2016, he had requested that time off for that already planned trip and understood that it had been approved.

Beasley testified that on three separate occasions he had submitted to Adams the necessary paperwork for approval of the time

off for the first part of his July 2017 absence — the period when he was on his family trip.  The second part of that July absence was unplanned; he got sick.  Beasley testified that immediately after he returned home from the family trip to Orlando he became ill with bronchitis and pneumonia and that when he returned to work he turned in a doctor's note for that absence.  Adams wasn't there the day Beasley came back to work, so Beasley gave his doctor's note to an associate supervisor.  Beasley does not know what happened to that note after he submitted it.

A few weeks later, on August 2, Beasley texted Adams that he was sick again and would miss work.  That August absence, along with the days he had missed in July, led to Beasley's documented verbal warning.  He testified that when he received this disciplinary warning for missing work on those occasions, he didn't get any feedback or have any conversations; instead Adams "just kept pushing the form toward" him.

Beasley received a written warning on December 28, 2017 for having arrived late for his shift twice during that month.  In the charge of discrimination that he filed with the EEOC, Beasley stated that he never received a verbal warning about his attendance before being issued that written warning.

On February 6, 2018, Beasley received a Final Warning for arriving late to work twice during the previous month.

### 2.  Beasley's Performance Reviews

Beasley received positive performance reviews in several categories while he worked for O'Reilly.  O'Reilly evaluates team

members after their first 84 days on the job with a "New Team Member Review" to decide whether to continue their employment past the training period.  For his New Team Member Review on July 12, 2016, Beasley received the highest rating in all categories except for attendance.  For attendance, he received the mid-grade rating of "needs improvement," one step above the lowest rating of "unsatisfactory."  O'Reilly decided to continue his employment.

After the initial "New Team Member Review," O'Reilly evaluates team members with regular "Performance Review[s]." During Beasley's time there, the regular performance review form included the following stated objectives for the evaluators: "[p]rovide each team member with a clear picture of his/her job responsibilities and feedback relative to individual performance[,] . . . [c]ontribute to the development of the team member by identifying and recognizing his/her individual strengths," and "[i]mprove communications between the team member and the team member's supervision."

The performance review forms also included a pay raise conversion table.  That table shows that the scores a team member receives in each category directly correlate to the amount of the member's raise, which is called a "merit increase" in pay.

Beasley's first regular review was on October 18, 2016, and he received satisfactory or high marks in all categories, except attendance where he received the score of "unsatisfactory."  The note accompanying that category stated: "Teddy was issued a Final Warning for attendance on 4/22/2016, due to a 'No Call No Show'

the previous day, Teddy's first day on the floor. Since then, Teddy has had no attendance issues at all and has proven to be highly reliable. This is [sic] rating is sure to be elevated on his next evaluation." Following that first review, he received a pay increase of $0.62 per hour.

Beasley had another review on April 12, 2017. He did not receive any unsatisfactory remarks in it. His attendance score improved to "exceeds requirements," because he had only one attendance "occurrence" during that six-month evaluation period. He was rewarded with a raise of $0.68 per hour. His next review, six months later, occurred on October 13, 2017. Again, he was evaluated as having either met or exceeded expectations. But his attendance score dropped to "meets requirements" because of the August 7, 2017 warning. He received a raise of $0.59 per hour, which was somewhat lower than the raises he had earned after his preceding two evaluations.

Beasley received and signed each of his performance reviews, but he testified that his supervisors had never discussed his performance or reviews with him. Instead, Beasley stated that he merely "signed the paper." His manager, McMenamin, testified that performance reviews should include a conversation so that supervisors can provide feedback and coach team members.

O'Reilly's HR representative, Heather Bolanos, testified that while some team members have a verbal discussion with supervisors about their performance, others opt to simply "read what's written, sign it and walk out." But she testified that progressive

discipline and evaluations do provide "an opportunity for both verbal and written communication." She did not know whether Beasley had a meaningful opportunity to discuss his review with his supervisor but had opted out of doing so.

### 3. O'Reilly's Failure to Provide an Interpreter as Requested

Several times during his employment with O'Reilly Beasley requested an interpreter but did not receive one. First, when Adams was training him to operate a forklift, Beasley asked for an interpreter after they had trouble communicating. Instead of providing an interpreter to facilitate the training, Adams stopped the training and Beasley went back to work.[4]

Second, Beasley requested an interpreter to discuss the disciplinary write ups after he received the August 7, 2017 warning for missing work because of his family trip and illness in July. He wanted one to help him communicate that the family trip absence was authorized and the absence for illness was covered by a doctor's note that he had provided. But O'Reilly did not provide him with an interpreter. Beasley tried to communicate with his

---

[4] The record shows that Beasley completed forklift operation training on May 10, 2017. Running a forklift was not a required part of Beasley's regular duties as an inbound materials handler, and the record does not indicate why he was trained on the forklift. Beasley appears to argue that he was entitled to a reasonable accommodation during forklift training, even if it was not part of his regular duties.

supervisor and O'Reilly HR representatives through gestures and verbally, but he was unable to do so effectively.[5]

Beasley testified that because of O'Reilly's progressive discipline scale, the attendance warnings he received after his August 7, 2017 warning — which Beasley maintained he should not have received — were more serious than they should have been. He testified that because he was not able to "resolve[]," or remove from his disciplinary record, his August 7, 2017 discipline without an interpreter, he was later "written up" when he otherwise would not have been. So according to Beasley, for the want of an interpreter he was unable to resolve the disciplinary dispute favorably, and for the want of a favorable resolution of that dispute, the attendance violations remained on his record.

Third, Beasley requested an interpreter for O'Reilly's company picnic, which was held in October of 2017. O'Reilly tried to provide one, but scheduling conflicts prevented it. Beasley's wife accompanied him to the picnic and was able to interpret for him.

---

[5] Beasley testified that he had "gestured" and "was pointing" in an attempt to communicate that the time off for his family trip had been approved in advance. He said that he "was trying to explain to [Adams] that [he] was supposed to be off [in July] and it had been a previous agreement . . . . But [Adams] just gestured like, oh well, I don't know."

Beasley explained that he "tried using [his] voice, [he] tried gesturing" but ultimately "asked . . . to have a meeting with an interpreter present" about his disputed discipline. He contends that if he had been provided an interpreter as he requested, he could have resolved the dispute by communicating that the absences were authorized and excused.

On January 11, 2018, Beasley emailed HR representative Bolanos to ask if any day-shift positions were available.[6]  Bolanos replied that none were available but she would let him know if one opened up.  A few weeks later on February 6, Beasley received a Final Warning for arriving late to work twice in January.  The same day he received that warning, Beasley submitted his resignation.

Beasley emailed Bolanos explaining his decision to resign. He wrote that working for O'Reilly had made his health issues worse and put a strain on his marriage.  Beasley explained that problems communicating with Adams and the inadequacies of the meeting summaries Adams had given him contributed to his decision to leave.  He explained that he had "tried to communicate with [Adams]" after the meetings but that "theres [sic] no way one whole sentence equal [sic] 5 to 10 min of conve[rsation] meeting before we spread out to work."  Beasley also told Bolanos that he had tried to work things out but that "it seems like the supervisors aren't doing their job."

Bolanos responded to Beasley's email by stating that she understood "completely" where he was coming from and she wanted to confirm his last day.  Beasley replied with another email  stating that he "would love" to stay at O'Reilly but could not continue to work night shifts, and that he "would love" to see O'Reilly "improve inside and out."  His last day of work was in February 2018.

---

[6] Beasley had first asked Bolanos about day-shift positions on August 31, 2017.

## B. Procedural History

After filing a charge with the EEOC and receiving a right to sue letter, Beasley filed this lawsuit against O'Reilly claiming that it had discriminated against him under Title I of the ADA by failing to provide him with reasonable accommodations while he worked for the company.[7] After the close of discovery, Beasley filed a motion for partial summary judgment on the issue of O'Reilly's liability. He contended that there was no genuine issue of material fact about its liability on his failure to accommodate claim and asked for a trial on damages. O'Reilly filed its own motion for summary judgment the same day, arguing that Beasley had not suffered an adverse employment action because of his disability and that none of his requested accommodations related to an essential job function.

The district court granted O'Reilly's motion for summary judgment and denied Beasley's. Relying on a footnote in *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1263 n.17 (11th Cir. 2007), the court determined that to succeed on a failure-to-accommodate claim a plaintiff must show that he suffered an adverse employment action. And the court was convinced that Beasley had failed to show that he had. It rejected his argument that O'Reilly's failure to provide an interpreter at, or more thorough summaries of, nightly pre-shift meetings exposed him to an unsafe work

---

[7] Beasley also raised other claims, but he has not contested before us the district court's grant of summary judgment against him on those claims.

environment because he could not understand or discuss the safety information presented at those meetings.  It also rejected Beasley's argument that if he had received a better accommodation for those meetings, he would have received higher scores on his performance evaluations, which in turn would have resulted in a higher salary.  According to the district court, Beasley needed to point to a "specific safety, training, or other job-related issue" that negatively affected his job performance, and he had not done so.

The district court also found that Beasley had not provided any evidence that his deafness caused him to miss work or prevented him from effectively communicating about his absences from work on the occasions he claimed they had been authorized.  According to the court, Beasley offered only speculation that an interpreter would have made a difference in these conversations, and he had failed to show why "a combination of verbal communication and written communication through his cell phone" was inadequate.

Alternatively, the court determined that O'Reilly was entitled to summary judgment because Beasley had failed to show that his requested accommodations would have enabled him to perform an essential function of his job.  The court did not consider forklift training, pre-shift meetings, disciplinary meetings, or the company picnic to be essential job functions and concluded that O'Reilly was not obligated to provide an accommodation for them.  The court acknowledged Beasley's argument that O'Reilly's failure to provide him an interpreter at the company picnic deprived him

of equal benefits and privileges of employment as compared to those enjoyed by non-disabled employees. But it concluded that he had not shown that it "prevented him from performing an essential job function."

About the failure to provide Beasley with an interpreter for forklift training, the district court determined that accommodation was not required because forklift operation wasn't "a significant component of Beasley's job," and he hadn't shown the lack of training affected his "ability to perform his job duties" or that he had been penalized for not being properly trained on the forklift.

The court considered Beasley's contentions about the communication obstacles he faced during and after the pre-shift meetings, but it dismissed those because of his failure to provide "concrete examples" of operational or safety information that he had missed. In the court's view, he had not shown he was deprived of any information that caused his job performance to suffer. As a result, the court concluded that a reasonable accommodation was unnecessary for Beasley to perform his essential job functions.

As for the lack of an interpreter for the "disciplinary meetings," the district court concluded that even if Beasley had been unjustly disciplined, he hadn't shown that an interpreter would have led to a different result. He had, the court said, failed to "elaborate on how additional counseling" could have "ameliorated" his problems with "show[ing] up for work on schedule." And it concluded that the "combination of verbal communication and written communication using his cell phone" was sufficient for Beasley

to explain his position that his absences in July were authorized and excused.

The district court granted O'Reilly summary judgment on all of Beasley's claims. He challenges the judgment against him only insofar as it involves his failure-to-accommodate claim.

## II.    STANDARD OF REVIEW

We review *de novo* a grant of summary judgment, meaning we apply the same legal standards as the district court without deference to its decision. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). Summary judgment is proper only if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    DISCUSSION

Title I of the ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also id.* § 12111(5) (defining "employer"). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that he (1) is disabled, (2) is a "qualified individual," and (3) was discriminated against because of his disability. *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *see also* 42 U.S.C. § 12111(8) (defining "qualified individual").

Under the ADA unlawful discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless doing so "would impose an undue hardship" on the employer.  42 U.S.C. § 12112(b)(5)(A).  An individual is "qualified" if "with or without reasonable accommodation, [he] can perform the essential functions of the employment position."  *Id.* § 12111(8).  Reasonable accommodations may include, among other things, the "adjustment or modification of examinations, training materials or policies," and "the provision of qualified readers or *interpreters . . .* for individuals with disabilities."  *Id.* § 12111(9)(B) (emphasis added).

## A.  Adverse Employment Action

An employer violates the ADA when it (1) "discriminate[s] against a qualified individual on the basis of disability" and (2) does so "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  *Id.* § 12112(a).  The first element — discrimination — occurs "when the employer fails to provide 'reasonable accommodations' for the disability — unless doing so would impose undue hardship on the employer."  *Lucas*, 257 F.3d at 1255; *see also Holly v. Clairson Indus.*, L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007) ("[A]n employer's failure to reasonably accommodate a disabled individual *itself* constitutes discrimination under the ADA, so long as that

individual is 'otherwise qualified,' and unless the employer can show undue hardship.").

But discrimination in the form of a failure to reasonably accommodate is actionable under the ADA only if that failure negatively impacts the employee's hiring, advancement, discharge, compensation, training, and other terms, conditions, and privileges of his employment. *See* 42 U.S.C. § 12112(a); *see also Holly*, 492 F.3d at 1263 n.17 (explaining that failure-to-accommodate plaintiffs must show (1) their employer unlawfully discriminated against them, or, "failed to reasonably accommodate [their] disability" and (2) this failure led to an "adverse employment decision"). Because Beasley's disability is his deafness, he must show that any failure of O'Reilly to accommodate his deafness negatively impacted the hiring, promotion, firing, compensation, training, or other terms, conditions, or privileges of Beasley's employment. *See* 42 U.S.C. § 12112(a). No failure to accommodate could have negatively impacted Beasley's hiring because he was hired, nor could any have negatively impacted him by contributing to his firing because he was not fired. That leaves for further consideration the promotion, compensation, training, or other terms, conditions, or privileges of Beasley's employment with O'Reilly. *See id.*

To begin with, Beasley repeatedly requested, and O'Reilly through Adams repeatedly failed to provide, written summaries of the replenishment team's nightly pre-shift meetings. When he didn't get adequate written summaries, or sometimes any summaries at all, Beasley requested an interpreter at the pre-shift meetings

to help him know what he would have learned at those meetings if he could hear, but no interpreter was provided.

A factfinder could reasonably determine that Beasley's inability to understand or participate in the pre-shift meetings did adversely affect the terms, conditions, and privileges of his employment. O'Reilly manager John McMenamin testified that important safety information was disseminated at these mandatory nightly meetings and that if an employee didn't hear this safety information, that would be a "failure." Safety is self-evidently a condition of employment in a warehouse, and a "failure" in regard to it is an important failure.

To be sure, there's no evidence that Beasley violated safety requirements or suffered an injury while on the job with O'Reilly. But a jury could reasonably find that if Beasley had been provided with more complete summaries of, or an interpreter for, these meetings, he would have received higher ratings in at least some of the categories of "Safety-Housekeeping," "Quality of Work," "Productivity," "Teamwork," and "Job Knowledge." And that higher ratings in his evaluations would have meant higher pay. *See supra* at 12–14.

After all, the pre-shift meeting information was apparently deemed essential for every team member on every shift, which is why everyone was required to attend. McMenamin testified that the meetings were important for team building, disseminating information, and communication about each employee's tasks for the day. According to him, even when there was nothing "major"

to discuss before a shift the replenishment team would have a pre-shift meeting "because we do it every day and we all come together and we do this, and that's how we start our day." Everyone, except Beasley, benefited from the meetings.

Beasley also requested and was denied an interpreter to discuss the discipline he received after he missed work from July 5 to July 14, 2017. He asserts that the first part of his time off was pre-approved for a family vacation and the second part of it was excused when he returned to work with a doctor's note showing that he had been sick. Beasley argues that, without an interpreter, he did not have an adequate opportunity to resolve his dispute about his absence and the discipline that was imposed on him because of it. Beasley's attendance record was a factor in his evaluations, and a factfinder could reasonably find that the discipline imposed on him for those attendance-related issues adversely impacted his scores. And in turn those lower scores adversely impacted the amount of the pay raises Beasley received.

The district court concluded that Beasley failed to show why he could not have resolved this attendance dispute through "a combination of verbal communication and written communication through his cell phone." It is true that the ADA does not entitle Beasley to his "preferred" accommodation. *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020). But there's a genuine dispute of material fact about whether using the alternatives that the district court suggested would have enabled Beasley

to effectively communicate with the HR representatives about the attendance dispute.

O'Reilly admits that when it hired Beasley, there was an understanding that he could request an interpreter from time to time as it became necessary. And Beasley testified that because "things were not getting resolved" he was "written up" on the attendance matter. There is a factual issue about whether the failure to provide Beasley with the accommodation he requested, instead of the one that the district court suggested and that O'Reilly argues was good enough, prevented Beasley from adequately discussing and successfully resolving the disciplinary dispute. Which in turn may have adversely affected that discipline decision and O'Reilly's evaluations, pay, and the later disciplinary actions imposed on him. *See Holly*, 492 F.3d at 1263 n.17.

Beasley also contends that O'Reilly violated the ADA by failing to provide him with an interpreter during his forklift training and during a company picnic. But he has presented no evidence of any "adverse employment decision" — or any other adverse consequence for that matter — related to O'Reilly's failure to provide an interpreter in either of those situations. *See id.* As for the forklift training, it's undisputed that Beasley completed the forklift training, and he didn't operate the forklift in his job as an inbound materials handler anyway. As for the company picnic, Beasley's wife accompanied him to the picnic and was able to interpret for him. Beasley has offered no evidence that any of the terms, conditions, or privileges of his employment were adversely affected as a result

of O'Reilly's not providing an interpreter during forklift training or during the picnic. *See* 42 U.S.C. § 12112(a). Beasley's failure to accommodate claim fails as to those two instances of alleged discrimination.

As we've explained, however, Beasley has created a genuine issue of material fact about whether adverse employment decisions resulted from O'Reilly's failure to accommodate his request for an interpreter for the nightly shift meetings and to help him resolve a disciplinary dispute about attendance. Now we turn to whether the failure to provide those requested accommodations meets the other requirements for his claim to survive summary judgment. *See Batson v. Salvation Army*, 897 F.3d 1320, 1326 (11th Cir. 2018).

### B. Essential Job Functions

Regardless of adverse employment decisions, O'Reilly contends that Beasley's claim fails because the accommodations that he requested were not necessary for him to be able to perform any essential job functions. The district court thought that our precedent required Beasley to show his requested accommodations served an essential job function, and it concluded that none of them did.

When faced with the question of whether an ADA plaintiff was a "qualified individual" under 42 U.S.C. § 12112(a), we have sometimes made broad statements that "[a]n accommodation is 'reasonable' *and necessary* under the ADA *only* if it enables the employee to perform the essential functions of the job." *Lucas*, 257 F.3d at 1259–60 (emphasis added); *see also LaChance v. Duffy's Draft*

*House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998) ("An accommodation is reasonable — and, therefore, required under the ADA — only if it enables the employee to perform the essential functions of the job.") (quotation marks omitted). And in a case where the employer provided all the accommodations that were required under the ADA, we said that "if an employee does not require an accommodation to perform her essential job functions, then the employer is under no obligation to make an accommodation."[8] *D'Onofrio*, 964 F.3d at 1022.

Those statements about essential job functions in those three decisions are expansive, but they are necessarily tethered to the facts of those cases. That is important because "whatever their opinions say, judicial decisions cannot make law beyond the facts of the cases in which those decisions are announced." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 762 (11th Cir. 2010) (quotation marks omitted); *see also id.* ("Statements in an opinion that are not fitted to the facts, or that extend further than the facts of that case, or that are not necessary to the decision of an appeal given the facts and circumstances of the case, are dicta. We are not required to follow dicta in our own prior decisions.") (citations and quotation marks omitted).

---

[8] *D'Onofrio* involved a failure-to-accommodate claim under the Florida Civil Rights Act of 1992, but we explained that "[g]iven the parallel structure of the statutes," we consider that claim "using the same framework" as one made under the ADA. 964 F.3d at 1021.

Not only that but, as the district court recognized, our broad statements about an essential function requirement are in tension with the text of the statute and the EEOC regulations that implement it.  The statute plainly prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  The terms, conditions, and privileges of employment are more than just the essential functions of a job.  *See id.*; *see also* 29 C.F.R. § 1630.2(o)(1).

We've repeatedly *said* that reasonable accommodations relate "only" to essential functions, even if we haven't reached any holdings that precedentially establish that rule.  *See, e.g.*, *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997) ("An 'accommodation' is 'reasonable'—and, therefore, required under the ADA—*only* if it enables the employee to perform the essential functions of her job.") (emphasis added) (citing 29 C.F.R. § 1630.2(o)(2)(ii)); *id.* at 283 (holding that "an ADA plaintiff (1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as a part of her burden of proving her case, must establish that such an accommodation is reasonable"); *see also Lucas*, 257 F.3d at 1259–60; *LaChance*, 146 F.3d at 835; *D'Onofrio*, 964 F.3d at 1022.[9]

---

[9] Other circuits that have addressed the issue head-on have held that the statutory text and its implementing regulations do not require a plaintiff to show a connection between a reasonable accommodation and the essential functions of his job.  *See Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 239

28                    Opinion of the Court                    21-13083

Based on *Lucas*, *LaChance*, and *D'Onofrio*, O'Reilly contends that it did not have to provide an interpreter for Beasley to participate in mandatory nightly meetings or to resolve his disciplinary dispute about attendance because those weren't essential functions of his job. A close look at the specific facts of those three decisions discloses the extent of their holdings and how distinguishable they are from the facts of this case.[10]

_____

(D.C. Cir. 2018) (rejecting the employer's argument that the plaintiff, who was a teacher, "did not need the accommodation of a classroom aide because he could perform the essential functions of his job without accommodation, 'but not without pain'" and holding that "[a] reasonable jury could conclude that forcing [the plaintiff] to work with pain when that pain could be alleviated by his requested accommodation violates the ADA"); *Feist v. La. Dep't of Just.*, 730 F.3d 450, 452–53, 454 (5th Cir. 2013) (holding that the plaintiff did not have to show "a nexus" between her requested accommodation — a free, on-site parking space — and the essential functions of her job as an assistant attorney general); *Sanchez v. Vilsack*, 695 F.3d 1174, 1182 (10th Cir. 2012) (holding that "a transfer accommodation for medical care or treatment is not per se unreasonable, even if an employee is able to perform the essential functions of her job without it").

[10] The same is true for *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997), a decision that O'Reilly doesn't mention. In that case, the plaintiff worked in a plant where laundry detergents were packaged, and her exposure to enzymes in the detergent caused her to have a persistent cough and skin rash. *Id.* at 283. She submitted to her employer a doctor's note that said: "There is nowhere within that building that she would be safe . . . . I reiterate: She should not be working in that building." *Id.* (ellipsis in original). The plaintiff alleged that her employer was required to make reasonable accommodations for her by transferring her or enclosing and air conditioning part of the plant for her. *See id.* at 283–84.

1. *Lucas*: A "Qualified Individual" Can Perform Essential
Job Functions (And the Employer Doesn't Have to
Eliminate Those Essential Functions)

In *Lucas* the plaintiff worked in a warehouse, but a few years after he was hired a back injury limited his ability to do physical labor. *See* 257 F.3d at 1252–53. We affirmed the grant of summary judgment for his employer on the ADA claim because the employee had failed to create a genuine issue of fact about whether his employer had discriminated against him because of his disability. *Id.* at 1256. Regardless of any broad statements about "essential job functions," *see id.* at 1259–60, we specifically addressed essential job functions in relation to two positions that the plaintiff argued he should have been reassigned to after his back injury: "Distribution Representative" and "Bins Sorter." Essential to both of those jobs was physical labor. *See id.* at 1259–60. We held that the plaintiff was not a "qualified individual" for one of the jobs, and for the other one, the ADA did not require the employer to restructure it in a way that would eliminate its essential functions. *See id.*

---

We *said* that "[a]n accommodation" is 'reasonable'—and, therefore, required under the ADA—only if it enables the employee to perform the essential functions of her job." *Id.* (citing 29 C.F.R. § 1630.2(o)(2)(ii)). But we *held* that the plaintiff could not prevail because she had "failed to produce evidence (after the *completion* of discovery) of the existence of any 'accommodation' at all, 'reasonable' or otherwise." *Id.* at 287 (emphasis in original). Whether her job functions were essential, non-essential, or somewhere in between was not the point. The evidence that she presented was that she could not work in that plant regardless. *See id.* Not so for Beasley. It is undisputed that he could do his job with reasonable accommodations.

In effect, the plaintiff wasn't a qualified individual for that job either because even with accommodations, he couldn't perform the essential functions the job required. *See id.*

The "Distribution Representative" position required physical labor to "prepare orders for shipment on the packing line." *Id.* at 1259. With or without an accommodation, the plaintiff could not do that work. *Id.* Because of that, we held that he was not a "qualified individual" for that job. *See id.* at 1258; *see also* 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.").

The other job the plaintiff thought he should be reassigned to was called "Bins Sorter." *See* 257 F.3d at 1259. The plaintiff took a slightly different angle in his argument about that job, asserting that it should have been "restructured" to accommodate him. *Id.*; *see* 42 U.S.C. § 12111(9)(B) (providing that "'reasonable accommodation' may include . . . job restructuring"); *see also* 29 C.F.R. § 1630.2(o)(2)(ii). But "squatting, kneeling, lifting, and carrying" were essential functions of that job, and the plaintiff couldn't do those things with or without an accommodation. 257 F.3d at 1260. That meant, in effect, that he wasn't a "qualified individual" for that position, even though we didn't use that term. *See id.*; *see also id.* at 1255 (explaining that a "qualified individual" is one who can perform the essential functions of the job with or without reasonable accommodations). We held that restructuring the Bins Sorter

position by eliminating squatting, bending, lifting, or carrying items would have changed the nature of the job, and "that is not something the ADA requires." *Id.* at 1260 (footnote omitted).

Our holdings about essential functions in *Lucas* do not entitle O'Reilly to summary judgment on Beasley's failure to accommodate claim. Unlike the plaintiff in *Lucas*, it's undisputed that Beasley is a qualified individual who was able to perform the essential functions of his job with reasonable accommodations. And unlike the plaintiff in *Lucas*, Beasley didn't ask his employer to "restructure" any job for him in a way that would eliminate the essential functions of that job in order to make him a qualified individual.

Instead, Beasley has presented evidence that he asked for reasonable accommodations that would enable him to participate in mandatory nightly meetings where important safety information was provided. And he asked for reasonable accommodations to help him communicate during his employer's progressive disciplinary process so that he might resolve a dispute about attendance that had a direct bearing on the raise he was eligible to receive.

Unlike the plaintiff in *Lucas*, Beasley is a "qualified individual" who has presented enough evidence to create a genuine issue of material fact about whether he was denied a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B) (providing that "'reasonable accommodation' may include . . . the provision of qualified readers or interpreters"); *see also* 29 C.F.R. § 1630.2(o)(2)(ii). Nothing about the holding in *Lucas* entitles O'Reilly to summary judgment on Beasley's failure to accommodate claim.

2. *LaChance*: Not a "Qualified Individual"

In *LaChance* the plaintiff, who had a long history of suffering from seizures, was hired as a line cook. 146 F.3d at 833–34. He had two seizures on the first night of work and one seizure on the second night. *Id.* at 834. After a few months on the job, he was given time off to adjust to some new medication but was later told not to return to work because his seizures made him a "liability" to the business. *Id.*

We concluded that the plaintiff had failed to show that, as a line cook, he wasn't a "direct threat" to his own and others' safety. *Id.* at 835. He "point[ed] to no probative evidence suggesting that [his employer] could have made his work site safe." *Id.* at 836. As a result, he was not a "qualified individual" because he was unable to perform his job with or without accommodations. *See id.* at 835–36. Unlike the plaintiff in *LaChance*, it's undisputed that Beasley was a "qualified individual" who could perform the essential functions his job with reasonable accommodations. Nothing about the holding in *LaChance* entitles O'Reilly to summary judgment on Beasley's failure to accommodate claim.

3. *D'Onofrio*: All Necessary Accommodations Were Provided

In *D'Onofrio* the parties conceded that the plaintiff, who was deaf, was a qualified individual with a disability; she could perform the essential functions of the job with a reasonable accommodation. 964 F.3d at 1021–22. But we concluded that the evidence was insufficient to support the jury's finding that her employer failed to reasonably accommodate her. *See id.* at 1021–23, 1031–32. Because

the employer had provided all the accommodations that were necessary under the ADA, we had no reason to delve into the essential job functions question. *See id.* "[T]he only accommodation [the employer] did not provide that [the plaintiff] had specifically requested was to move [her manager] to another location — and, given the circumstances" of that case, the ADA did not require the employer to comply with that request. *Id.* at 1031. The plaintiff in *D'Onofrio* could not "point to a specific instance in which she needed an accommodation and was denied one." *Id.* at 1032 (quotation marks omitted).

Unlike the plaintiff in *D'Onofrio*, Beasley has pointed to specific instances in which he needed a reasonable accommodation but was denied one. Nothing about the holding in *D'Onofrio* entitles O'Reilly to summary judgment on Beasley's failure to accommodate claim.

In *Lucas*, *LaChance*, and *D'Onofrio*, we did not have to decide whether the denial of the employees' requests for reasonable accommodations subjected them to discrimination based on their disabilities by preventing them from performing essential job functions. To the extent that those three opinions' broad statements about essential job functions go beyond the facts of those cases, we are not bound by those statements. *See, e.g.*, *Pretka*, 608 F.3d at 762. And, as we have discussed, the facts of those cases are different from the ones in this case.

So what do we hold about whether the ADA's requirement that an employer provide an employee with reasonable

accommodations extends beyond those that will enable him to perform the essential functions of his job? Nothing, really. There is enough dicta on that subject already. And any firm conclusion we reach about it in this case will only add more dicta. It will be dicta because regardless of the decision we reach about that issue, the result in this case will not be affected. It won't matter to the result of this appeal because even if the accommodation requirement is limited to essential job functions, the two requested accommodations left in our decision tray both involve essential job functions.

Essential functions "are the fundamental job duties of a position that an individual with a disability is actually required to perform." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(2)(1)). When determining what's essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8). An employer's judgment includes the opinion of the plaintiff's supervisor. *See Holly*, 492 F.3d at 1257. Other relevant factors are:

> (1) the amount of time spent on the job performing the function, (2) the consequences of not requiring the incumbent to perform the function, (3) the terms of [a] collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the

> current work experience of incumbents in similar
> jobs.

*Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (citing 29 C.F.R. § 1630.2(n)(3)).

First, the evidence indicates that attending the replenishment team's nightly pre-shift safety meetings and understanding what was said during them were essential components of Beasley's employment. An O'Reilly manager testified that the meetings were an important part of a team member's employment and that it would be a "failure" if a team member didn't receive the meeting's safety information. We give weight to the manager's judgment about that. *See Holly*, 492 F.3d at 1257. And the meetings were mandatory, which is some indication of their importance. Beasley didn't have the option to skip them, even if he was unable to understand what was being said in them. It is true that these meetings were not included in Beasley's official job description, a fact that we do consider, *see Samson v. Fed. Express Corp.*, 746 F.3d 1196, 1201 (11th Cir. 2014), but they were still mandatory, not optional.

Beasley's ability to participate meaningfully in the disciplinary meetings about his attendance was also essential. O'Reilly's HR representatives testified that disciplinary warnings involved an opportunity for both verbal and written communication, which is an important part of the progressive discipline process. An O'Reilly manager testified that the "coachings" that are supposed to flow from the disciplinary process are designed to help team members

improve and succeed. That manager testified that disciplinary meetings are important for both sides — supervisors and employees — to fully participate in and that O'Reilly wants every team member to have the information communicated in them. A reasonable jury could find that even though disciplinary meetings were not part of Beasley's day-to-day functions as an inbound materials handler, they were an essential part of the job. Not only that but the result of his disciplinary proceedings directly affected the amount of the pay raise he received.

## IV.  CONCLUSION

The district court's grant of summary judgment in favor of O'Reilly is REVERSED. The case is REMANDED for further proceedings involving Beasley's claim that O'Reilly violated the ADA by failing to provide him with reasonable accommodations regarding the nightly pre-shift safety meetings and regarding his disciplinary proceedings involving the attendance issues.

**REVERSED AND REMANDED.**

LUCK, Circuit Judge, concurring:

In *Lucas v. W.W. Granger, Inc.*, 257 F.3d 1249 (11th Cir. 2001), we said, as to an employee's Americans with Disabilities Act reasonable-accommodation claim, that "[a]n accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." *Id.* at 1259–60. I join all of the majority opinion except for the part where it calls that statement from *Lucas* dicta. The statement was not dicta—it was essential to the holding of that case. Here's why.

The *Lucas* plaintiff had worked for a commercial supply company, originally as a will-call service representative. *Id.* at 1252. But he developed back issues and got furloughed after he couldn't perform the warehouse work his service representative job required, and he was denied reassignment to a better position. *Id.* at 1254. Later, the company attempted to create a "bins sorter" position for him that had lighter duty requirements, but the plaintiff's doctor wouldn't approve the new position without modifications that the company refused to make. *Id.* at 1254–55.

When he sued under the ADA, the plaintiff proposed several reasonable accommodations that included (1) being reassigned from his position as a service representative to a position as a distribution representative, and (2) restructuring the bins sorter position in line with his medical limitations. *Id.* at 1256. As to the *reassignment* request, *Lucas* held that the plaintiff wasn't "otherwise qualified" to be a distribution representative because that position required physical labor exceeding the plaintiff's medical

restrictions. *Id.* at 1258. To this point, I agree with the majority opinion's reading of *Lucas*.

But as to the *restructuring* request for the bins sorter position, we did not rely on the fact that the plaintiff wasn't otherwise qualified. Instead, we explained that "job restructuring is required only where it is reasonable," and we held that the plaintiff's request to restructure the bins sorter position wasn't reasonable because it would entail "eliminating functions that are essential to the nature of the job as it exists." *Id.* at 1259. The proposed accommodation thus wouldn't "enable[] the [plaintiff] to perform the essential functions of the job," so it was not "'reasonable' and necessary" under the ADA. *Id.*

The part of *Lucas* about when an accommodation was "'reasonable' and necessary" under the ADA, *id.*, was an essential part of our reasoning that was independent of our earlier "otherwise qualified" analysis. It was the sole ground for denying the plaintiff relief as to his request to restructure the bins sorter position. We *could have held* that the *Lucas* plaintiff wasn't "otherwise qualified" for the bins sorter position because he couldn't perform the essential functions. But we didn't. Rather, we held that his requested accommodation was unreasonable because it didn't enable him to perform those essential functions. *Id.* at 1260.

Importantly, the *Lucas* court's essential functions language did not outstrip the facts of the case. The plaintiff sought an accommodation that was contrary to the essential functions of the bins sorter job. His accommodation didn't enable him to perform

21-13083                 Luck, J., Concurring                 3

the essential functions of the job.  His restructuring request "would have changed the nature of the beast, and that is not something the ADA requires."  *Id.* (footnote omitted).

There are any number of ways an issue in a case may be decided.  But once the court picks a lane, I don't see how that choice is dicta.  *See United States v. Files*, 63 F.4th 920, 928 (11th Cir. 2023) ("[S]tatements of a legal rule—whether or not the result of a choice among competing alternatives—are often technically unnecessary to a case's resolution. . . .  But no one thinks that when we *do* state a governing rule—as we typically do—we do so gratuitously and unnecessarily.").

It may be, as Mr. Beasley and the Equal Employment Opportunity Commission argue, that *Lucas*'s holding is inconsistent with the ADA's text and implementing regulations.  But *Lucas* continues to bind us until the en banc court or the Supreme Court tells us otherwise.

With the exception of its discussion of *Lucas*, I join the majority opinion.