[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12045

_____

JENNIFER AKRIDGE,

Plaintiff-Appellant,

*versus*

ALFA INSURANCE COMPANIES,

Defendant,

ALFA MUTUAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket No. 2:17-cv-00372-JTA

_____

Before GRANT, ABUDU, and HULL, Circuit Judges.

HULL, Circuit Judge:

Plaintiff Jennifer Akridge appeals the entry of summary judgment for her former employer, defendant Alfa Mutual Insurance Company, on her claim brought under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112(a). Akridge contends Alfa discriminated against her by terminating her to avoid paying healthcare costs related to her multiple sclerosis ("MS") and severe migraines. Akridge stresses that Alfa self insures for medical plans.

Alfa responds that after most of Akridge's duties became automated, her position was no longer needed, and Alfa eliminated it to cut business expenses. Alfa's medical plan was administered by a third party, BlueCross BlueShield ("BCBS"). Alfa argues there is no evidence Alfa's decisionmakers knew Akridge's healthcare costs.

Additionally, Akridge asserts that she is not required to show her disability was a but-for cause of her termination but may simply show it was a motivating factor. Akridge also appeals the award of $1,918 in discovery sanctions in favor of Alfa.

After review, and with the benefit of oral argument, we affirm the grant of summary judgment in favor of Alfa and the sanctions award of $1,918 against Akridge.

## I.    FACTUAL BACKGROUND

Because Akridge was the non-moving party at summary judgment, we view the evidence in the light most favorable to her and draw all reasonable inferences in her favor. *Crane v. Lifemark Hosps., Inc.*, 898 F.3d 1130, 1133-34 (11th Cir. 2018). When factual conflicts arise, we must credit the non-moving party's version. *Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013).

### A. Akridge's Employment at Alfa

In 1989, Akridge began working at Alfa, an insurance company. In 1993, Akridge was diagnosed with MS and began suffering from severe migraines.

By 2015, Akridge was promoted to a strategic coordinator position in Alfa's auto underwriting department. Akridge's primary task concerned the strategic underwriting program, in which she worked with Alfa's agents and district managers to identify profitable policies for struggling agents.

Akridge also (1) prepared a monthly strategic underwriting report for that program; (2) created manuals for auto and watercraft underwriting; (3) verified proofs of insurance for lawsuits with auto claims; (4) assisted with rate filings for the state insurance department; and (5) taught workshops for agents and district managers.

By all accounts, Akridge excelled at her job, with excellent performance reviews. In the mid-nineties, Alfa named her employee of the year. Akridge estimated that she reduced Alfa's losses by $2 million in her first nine months as coordinator of the strategic auto underwriting program.

Alfa was self-insured and paid the healthcare costs of its employees. Akridge estimated that it cost Alfa between $10,000 and $12,000 per month to treat her MS and migraines. While it was common knowledge at Alfa that Akridge had MS, no one at Alfa ever said anything to Akridge about her healthcare costs.

## B. Guidewire

Between 2012 and 2016, Alfa developed Guidewire, a new computer program that "changed how [Alfa] d[id] business" because it automated certain capabilities. Among other things, Guidewire enabled agents and district managers to access the strategic underwriting information that Akridge previously gathered and distributed. Alfa estimated Guidewire would cost $90 million to develop, but it ultimately cost between $150 and $160 million.

## C. Decisionmakers and the Decision to Terminate Akridge

In 2016, Akridge's chain of command was as follows: (1) her immediate supervisor was Robert Plaster, Director of Underwriting Services; (2) Plaster reported to Beth Chancey, Vice President of Property and Casualty Operations; and (3) Chancey

reported to Tommy Coshatt, Senior Vice President of Property and Casualty Underwriting (collectively the "decisionmakers").

The decisionmakers discussed eliminating Akridge's position for one to two weeks before her termination. They ultimately decided to terminate Akridge because some of her responsibilities were now automated and other responsibilities that could not be automated were absorbed by other employees. Akridge's non-automated responsibilities were given "to other people in the department that had been doing those [tasks] as well." Chancey testified that Alfa did not have enough spare responsibilities to combine with these non-automated duties to keep Akridge's position or create a new one for her.

Regarding automation, the decisionmakers testified that Alfa had automated the strategic underwriting program, including the report Akridge created. Essentially, Akridge's interaction with agents and district managers using information from the strategic underwriting report became an automated "pull and a self-service functionality," allowing agents and district managers in the field to access that information themselves.

Plaster, Akridge's direct supervisor, characterized this responsibility as the "major portion of [Akridge's] job" that was now automated, and that her remaining responsibilities were "minor parts, very small." Akridge confirmed that "[w]orking with the agents and district managers" using "data from the reports was the majority of [her] day." As for Akridge's workshops, Chancey testified that they were meant to introduce agents to the strategic

underwriting report and were no longer needed after the agents became familiar with the report because they could direct questions to their supervisors. Coshatt and Plaster also testified that Alfa increased webinars and eLearning instead of relying on Akridge's workshops.

Having made their decision, but prior to terminating Akridge, the decisionmakers spoke with Susan White, who worked in Alfa's human resources ("HR") department. White was not involved in the decision to terminate Akridge. White only advised the decisionmakers on the administrative steps of terminating Akridge, including drafting a severance agreement and calculating her final paycheck. Akridge's disabilities did not come up during these conversations.

In December 2016, Coshatt and Plaster informed Akridge in person that Alfa was eliminating her position effective immediately due to the expense of developing Guidewire and in the interest of cutting business expenses companywide. During this meeting, Coshatt and Plaster did not mention Akridge's disabilities or healthcare costs.

They also provided Akridge with Alfa's standard severance agreement and general release. Below the signature lines, the agreement had a handwritten notation designating Scott Forrest as who would sign on behalf of Alfa. Forrest was Alfa's Senior Vice

President of Human Resources and Facilities.[1]  Forrest signed all employee releases, which included a waiver for ADA claims. Akridge did not sign the severance agreement.

After being terminated, Akridge wished to remain at Alfa, but she did not apply to any open positions.  Akridge asked Al Dees, Vice President of Marketing, if he could create a new position for her.  Dees told Akridge that he already had created marketing positions for two other employees from the underwriting department whose positions were eliminated, and he could not create another position for her.  At the time of her termination, there were no openings in the underwriting department.  White on her own reviewed openings in other departments, but she did not think Akridge's skills would be a good fit.

## D. Knowledge of Healthcare Costs

As background, here is how Alfa's self-insurance plan worked.  Alfa paid BCBS to administer its health insurance plan. BCBS sent Alfa a weekly bill for the total amount of Alfa's employees' healthcare costs, and Alfa wired that amount to BCBS. The BCBS bill gave a total amount of healthcare costs, did not list individual healthcare costs by employee, and did not note high healthcare costs, for example, if an employee had an expensive surgery.

---

[1] Since Akridge's termination, Forrest has become Alfa's Executive Vice President of Administration.

Forrest was the BCBS contact for Alfa. Forrest was aware of amendments to Alfa's health insurance plan, but he would not know how any amendment affected an individual employee. BCBS owned another entity, Prime, which made some decisions about drug coverage under Alfa's health insurance plan without Alfa's involvement.

Alfa did not maintain information about individual employees' healthcare costs. Instead, BCBS stored the individual healthcare costs of Alfa employees in a system separate from Alfa. White testified that Holly Dean and Kate Taylor, members of Alfa's HR benefits team, had access to the BCBS system, but White did not have such access. In their affidavits, Dean and Taylor confirmed that although they had access to the BCBS system, they had not used this access to view any individual employee's healthcare costs.

Akridge contends that the true reason for her firing was the high cost of treating her MS and migraines. Akridge asserts the fact that she was fired instead of demoted or transferred within Alfa evinces that true reason. Akridge also testified that she believed Forrest was ultimately responsible for her termination. Akridge stated that, as the head of HR, Forrest had access to what BCBS paid for her healthcare costs, which Akridge contended Forrest gave to the decisionmakers. However, Akridge admitted that she did not know whether Forrest actually accessed her healthcare costs and communicated them to the decisionmakers. Akridge stated that she simply believed he did because (1) she was

ultimately terminated and (2) her healthcare costs were higher than the average employee.

Akridge also noted that within approximately two years prior to her termination, Alfa once, and maybe twice, told employees to go to the doctor only if medically necessary and that rising healthcare costs affected the healthcare premiums of all Alfa employees. Nine months after her termination, BCBS informed Akridge that her Consolidated Omnibus Budget Reconciliation Act ("COBRA")[2] insurance would no longer cover her particular migraine medication due to its cost. BCBS informed Akridge that she would need to contact Alfa about her change in coverage.

Akridge also produced a document titled "Group Reporting" from "BlueCross BlueShield of Alabama." The document lists a "billing" amount and a corresponding "payment" amount for healthcare costs in 2009 for certain employees, but not for Akridge. Some of the higher payments appear highlighted or otherwise marked, including payments of $18,890, $6,501.67, and $56,235. A $34.68 charge is also marked.

In her affidavit, Dean, Alfa's HR Benefits Manager, described a similar document from 2016 that Alfa received from BCBS. The 2016 document identified another Alfa employee with MS who was not Akridge and that employee's healthcare costs. Dean stated that

---

[2] COBRA entitles employees to a continuation of their healthcare coverage for a period of time post-termination. *See* 29 U.S.C. §§ 1161, 1163(2); *Cummings v. Wash. Mut.*, 650 F.3d 1386, 1389-90 (11th Cir. 2011).

(1) the 2016 document was prepared by BCBS as part of its annual "Renewal Analysis" and sent to Alfa; (2) Alfa did not determine what information would be included in BCBS's analysis; and (3) Alfa had not requested this document.

While the three decisionmakers, Plaster, Chancey, and Coshatt, knew of Akridge's disabilities, each expressly denied knowing her, or any other employee's, healthcare costs. White and Forrest also denied knowing any individual employee's healthcare costs.

### E.  Akridge's Proffered Comparators

Akridge proffered several non-disabled employees who she asserts were similarly situated to her in the underwriting department but were not terminated.  First, Akridge presented Hillery McCaleb.  Akridge and McCaleb both "worked with agents who were not profitable," "handled manuals for [their] respective areas[,] and worked with the state insurance department in filing the manual and changes to it."  Akridge admits, however, that McCaleb "worked on the property/home side" of the underwriting department, while Akridge "worked on the auto side."

Further, Coshatt testified that Akridge had responsibilities in auto underwriting that Alfa automated, but McCaleb's work in homeowner underwriting had not become as automated. According to Coshatt, McCaleb performed other special projects in the homeowner underwriting department that could not be automated.

Second, Akridge proffered these five employees as comparators: Becky Roper, Kim Byrom, Brennan Goray, Teri Williams, and Sonya McInvale. These employees worked in the underwriting department, but Akridge did not know their job titles or the general work they performed.

Chancey testified that these five employees worked under her chain of command. Chancey stated that these employees developed and implemented Guidewire. Chancey explained that "[w]hat [Akridge] was doing was totally different than what this team was doing," and Akridge's responsibilities with the strategic underwriting program were automated and her remaining responsibilities were absorbed by others. When asked whether anything distinguished these five employees from Akridge, Coshatt testified that Akridge's responsibilities were automated to a greater extent.

## II.    PROCEDURAL HISTORY

### A. Akridge's Amended Complaint

In her amended complaint, Akridge alleged that Alfa violated the ADA by terminating her. Akridge claimed that Alfa discriminated against her based on her disability by firing her to

avoid paying her healthcare costs.  Akridge sought compensatory and punitive damages, costs, and reasonable attorney's fees.

## B.  Depositions and Discovery Disputes

Akridge deposed Coshatt, Chancey, and Plaster.  Akridge also deposed White twice as Alfa's designated corporate representative under Rule 30(b)(6).[3]

After White's first deposition, the court determined that White was unable to answer certain questions outlined in Akridge's Rule 30(b)(6) notice.[4]  The court extended the discovery period to allow Akridge to depose again a corporate representative under Rule 30(b)(6).  Alfa again designated White as its representative.  Akridge took White's second deposition as Alfa's Rule 30(b)(6) representative.

Several times, Akridge moved to compel the deposition of Scott Forrest, the head of HR.  The court denied each motion.  In a sworn declaration, Forrest denied any role in Akridge's termination.  Consequently, the court found that Forrest's testimony "[wa]s no more than minimally relevant" and that

---

[3] Under the Federal Rules of Civil Procedure, a party may notice an individual for deposition under Rule 30(b)(1), while "Rule 30(b)(6) is the principal mechanism for deposing entities." *Consumer Fin. Prot. Bureau v. Brown*, 69 F.4th 1321, 1324 n.1 (11th Cir. 2023).  For brevity, we refer to these as Rule 30(b)(1) and Rule 30(b)(6).

[4] At the outset of the case, the parties consented to have a magistrate judge conduct all proceedings under 28 U.S.C. § 636(c).  Throughout, we refer to the magistrate judge as "the court."

compelling his deposition was "disproportional to the needs of the case" because Akridge could depose Plaster, Chancey, and Coshatt, the decisionmakers.

After Akridge produced documents indicating that Forrest had responsibilities over Alfa's health insurance plan, the court found that Akridge still failed to show that Forrest had knowledge of her termination, and it denied Akridge's final motion to compel Forrest's deposition.

## C. Summary Judgment and First Appeal

Ultimately, the court entered summary judgment in favor of Alfa. The court determined that (1) none of Akridge's comparators were similarly situated and (2) her evidence was insufficient for a reasonable jury to infer that she was fired because of her healthcare costs. The court observed that none of Akridge's evidence indicated that the decisionmakers knew her individual healthcare costs.

Akridge appealed. In that prior appeal, this Court reversed the denial of Akridge's motion to compel Forrest's deposition, vacated the summary judgment, and remanded for Akridge to take Forrest's deposition. *Akridge v. Alfa Mut. Ins.*, 1 F.4th 1271, 1278 (11th Cir. 2021). We did not reach the summary judgment issue. As to Forrest's deposition, we explained that Forrest's role at Alfa and his access to health insurance information "are relevant and thus sufficient to make his testimony discoverable." *Id.* at 1277.

## D. Discovery Dispute on Remand and Sanctions

On remand, Akridge noticed Forrest for deposition individually under Rule 30(b)(1) and as Alfa's corporate representative under Rule 30(b)(6). Alfa responded that Forrest was available for deposition in his individual capacity, but it declined to designate Forrest to testify as Alfa's corporate representative under Rule 30(b)(6).

Akridge, nonetheless, filed a motion to compel Alfa to produce Forrest for a Rule 30(b)(6) deposition and for sanctions. Alfa countered with its own motion for sanctions.

At a hearing on the motions, the court pointed out that this Court's opinion in the initial appeal did not mention Rule 30(b)(6) and that a party seeking a corporation's deposition under that rule could not designate the representative to testify on the corporation's behalf. The court denied Akridge's motion to compel Forrest as a Rule 30(b)(6) witness and granted in part Alfa's sanctions motion, awarding reasonable expenses incurred in opposing Akridge's motion.

## E. Forrest's Deposition

Akridge then deposed Forrest individually, who testified as follows. He was not involved in the decision to terminate Akridge. Rather, the Executive Vice President of each department at Alfa was responsible for decisions to terminate or eliminate positions. As the Senior Vice President of HR, Forrest could have eliminated jobs or terminated an employee only if they worked in the compensation, benefits, or HR department.

Coshatt and White told Forrest that Akridge's position was eliminated and that Plaster, Chancey, and Coshatt were involved in that decision.  Forrest did not ask Coshatt how much money Alfa saved by eliminating Akridge's salary and medical costs.  Alfa did not have a general policy of transferring employees whose positions were eliminated to different positions in the company.

Forrest further testified that Alfa did not maintain the individual healthcare costs of its employees because that information was stored at BCBS.  BCBS sent Alfa the total employee-medical costs, but this information was not broken down by employee.  Forrest was the contact for Alfa's BCBS plan and spoke with BCBS once a year.  Forrest did not know of any health insurance benefits that were excluded from its plan by BCBS or Alfa since 2015.

Following his promotion in 2016 to Executive Vice President, Forrest was given responsibility over Alfa's accounting, finance, and investment departments.  Since 2016, Alfa eliminated (1) 10 positions in its accounting department and (2) a significant number of positions in the investments department, including by closing its real estate investment department.

## F.  Second Summary Judgment Motion

Alfa filed its second motion for summary judgment, which the court granted.  First, the court rejected Akridge's argument that she could pursue her ADA claim under the mixed-motive theory in the Title VII decision of *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016).  The court pointed to a subsequent

unpublished decision, *Barber v. Cellco Partnership*, 808 F. App'x 929 (11th Cir. 2020), in which this Court explained that the mixed-motive theory, discussed in *Quigg*, did not apply to ADA actions. As a result, the court concluded that Akridge had to show her disability was a but-for cause of her termination and not merely a motivating factor for that decision.

Second, the court found that Akridge failed to establish a prima facie case of disability discrimination under the ADA because she did not present a proper comparator. The court concluded that (1) McCaleb was not a proper comparator because her job functions were not automated and she worked in a different underwriting department (homeowner underwriting) with different responsibilities than Akridge and (2) Roper, Byrom, Goray, Williams, and McInvale were not proper comparators because Akridge did not present evidence that they had job functions similar to hers.

Third, the court noted that even if Akridge established a prima facie case, her evidence failed to show that Alfa's reason for firing her—that her position was no longer needed and it wished to cut business expenses—was pretext for disability discrimination. The court explained that each decisionmaker testified that Akridge's position was no longer necessary and there was no evidence that her disability affected the decision to eliminate her position.

Fourth, the court determined Akridge's circumstantial evidence did not create a convincing mosaic that would allow a jury

to infer intentional disability discrimination.  The court concluded that (1) while Akridge was fired and not transferred to a new position, she admitted she never applied to an open position at Alfa and (2) the decisionmakers testified that they were unaware of Akridge's healthcare costs.

## III.    STANDARDS OF REVIEW

We review *de novo* a grant of summary judgment.  *See Crane*, 898 F.3d at 1133-34.  We also review for an abuse of discretion an award of sanctions under Federal Rule of Civil Procedure 37.  *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1146-47 (11th Cir. 2006).

## IV.    AKRIDGE'S ADA CLAIMS

The ADA bars employers from "discriminat[ing] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a). On appeal, Akridge challenges the entry of summary judgment on her claim that Alfa discriminated against her by terminating her to avoid paying her high healthcare costs.

Akridge does not challenge the court's finding that she presented no direct evidence of disability discrimination. Therefore, we examine whether she established a prima facie case.

When evaluating an ADA claim, we use the same *McDonnell Douglas* burden-shifting framework that often applies in Title VII claims. *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1215 (11th Cir. 2021); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In the absence of direct evidence, this framework allows the

plaintiff to establish a prima facie case of disability discrimination using circumstantial evidence. *Todd*, 998 F.3d at 1215. If the employee is successful in making a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its decision. *Id.* at 1216. The burden then shifts back to the employee to present sufficient evidence creating a genuine issue of material fact that the employer's reason is pretext for discrimination. *Id.*

An ADA plaintiff establishes a prima facie case by showing (1) she has a disability; (2) she is a qualified individual under the ADA; and (3) the employer discriminated against her "on the basis of disability." *See Beasley v. O'Reilly Auto Parts*, 69 F.4th 744, 754 (11th Cir. 2023); 42 U.S.C. § 12112(a). Alfa does not dispute that Akridge meets these first two prongs, so we discuss only the third prong.

## A. But-For Causation Prong

To begin, we set forth three principles about the statutory language "on the basis of disability" in § 12112(a) and the level of causation it requires.

First, our Court has long understood the ADA as imposing a "but-for" causation standard—that is, an adverse employment action would not have occurred but for the plaintiff's disability. *See, e.g., McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996); *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1263 n.17 (11th Cir. 2007). In 2008, however, Congress amended the ADA's causal language to prohibit discrimination "on the basis of disability"

instead of "because of" disability. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 5, 122 Stat. 3553. We have yet to address the impact, if any, of this amendment.

Several circuits have concluded that this amended language—"on the basis of"—invokes but-for causation. *See Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019) ("We find no reason to hold that there is any meaningful difference between 'on the basis of,' 'because of,' or 'based on,' which would require courts to use a causation standard other than 'but-for.'"); *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016) ("We see no 'meaningful textual difference' between ['on the basis of'] and the terms 'because of,' 'by reason of,' or 'based on.'"); *Murray v. Mayo Clinic*, 934 F.3d 1101, 1106 & n.6 (9th Cir. 2019) ("We find no meaningful textual difference in the two phrases with respect to causation."); *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315, 321 (6th Cir. 2012) (en banc) (recognizing the 2008 amendments to the ADA and holding that the ADA requires but-for cause).

Furthermore, the Supreme Court has instructed that "[t]his ancient and simple 'but for' common law causation test . . . supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated," including for "federal antidiscrimination laws . . . ." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. ----, 140 S. Ct. 1009, 1014 (2020). And the particular phrase "*on the basis of*" is "strongly suggestive of a but-for causation standard." *Id.* at 1016 (quotation marks omitted);

*see also Burrage v. United States*, 571 U.S. 204, 213 (2014) ("Our insistence on but-for causality has not been restricted to statutes using the term 'because of.'  We have, for instance, observed that in common talk, the phrase 'based on' indicates a but-for causal relationship." (cleaned up)).

We agree with our sister circuits and hold that the switch from "because of" to "on the basis of" in the 2008 amendment to the ADA did not change or affect its but-for causation standard.

Second, we recognize that Akridge argues that she is not required to show her disability was a but-for cause of her termination but may simply show it was "a motivating factor."  We disagree.

This motivating-factor causation standard located in Title VII is distinct from, and "more forgiving" than, a but-for standard, as "liability can sometimes follow even if [a protected trait] *wasn't* a but-for cause of the employer's challenged decision."  *Bostock v. Clayton Cnty.*, 590 U.S. 644, 140 S. Ct. 1731, 1740 (2020).  In contrast, but-for causation requires an employee to show that a cause was outcome determinative, meaning that "a particular outcome would not have happened 'but for' the purported cause."  *Id.* at 1739.

The problem for Akridge is that the employee-friendly, motivating-factor standard does not apply to ADA claims, as this standard is drawn directly from the text of Title VII.  *See* Title VII of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166,

§ 107, 105 Stat. 1071; 42 U.S.C. § 2000e-2(m)  ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice . . . .") (emphasis added).    Because the ADA does not contain similar motivating-factor language, Akridge cannot resort to this lesser showing.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (holding "a motivating factor" causation standard did not apply to claims brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a), because, "[u]nlike Title VII, the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor"); *Comcast Corp.*, 140 S. Ct. at 1017-18 (declining to extend this motivating-factor standard to claims brought under 42 U.S.C. § 1981 because of the distinct histories of Title VII and § 1981 and the absence of this motivating-factor language in § 1981).[5]

Even as to Title VII, the Supreme Court has pointed out that Congress chose to place a motivating factor language in only a subset of Title VII claims and not as to other Title VII claims, such as retaliation, which still use but-for causation.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353, 362 (2013).

---

[5] For similar reasons, this Court recently held that the proper causation standard for a retaliation claim under the Family and Medical Leave Act, 29 U.S.C. § 2615(a)(2), is but-for causation, not motivating-factor causation. *Lapham v. Walgreen Co.*, 88 F.4th 879, 890-893 (11th Cir. 2023).

22                    Opinion of the Court                    22-12045

Notably too, when Congress added "a motivating factor" language to Title VII, it contemporaneously amended the ADA without including this lesser standard. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, §§ 107, 109, 105 Stat. 1071; *see also Gross*, 557 U.S. at 174 (noting Congress amended the ADEA alongside Title VII but did not add this motivating-factor standard to the ADEA); *Comcast Corp.*, 140 S. Ct. at 1017-18 (noting Congress contemporaneously amended Title VII and § 1981, "[b]ut nowhere in its amendments to § 1981 did Congress so much as whisper about motivating factors"). For these reasons, we hold that a plaintiff may not pursue an ADA discrimination claim by showing "a motivating factor" causation but must show but-for causation.

To be complete, we note that Akridge relies on our decision in *Quigg*. But *Quigg* was a Title VII case and had nothing to do with the ADA. The *Quigg* court simply explained how *McDonnell Douglas* in a Title VII case was not the proper framework for evaluating mixed-motive claims that rely on circumstantial evidence.[6] *Quigg*, 814 F.3d at 1232-33, 1236-40.

---

[6] An employee presents a Title VII claim under a "mixed-motive" theory when she alleges both legitimate and discriminatory reasons were motivating factors for an adverse employment action. *Gross*, 557 U.S. at 171; *see also Quigg*, 814 F.3d at 1235 ("An employee can succeed on a mixed-motive claim by showing that illegal bias . . . was a motivating factor for an adverse employment action, even though other factors also motivated the action." (quotation marks omitted)). Single-motive claims require the employee to show that an impermissible consideration "was the true reason for the adverse action." *Quigg*, 814 F.3d at 1235.

Third, Akridge's reliance on *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322 (11th Cir. 1999), is also misplaced. Our *Farley* decision confirmed that the ADA required "but-for" causation. Let's examine the context too.

In *Farley*, the jury found that the employer violated the ADA when it terminated a disabled employee. 197 F.3d at 1326. The district court had instructed the jury that discrimination could be shown if disability was "a motivating factor." *Id.* at 1330, 1333-34, 1334 n.5 (quotation marks omitted). On appeal, the defendant employer argued that the district court erred by not instructing the jury that disability must be the sole reason for the employee's termination, that is, "*the* motivating factor." *Id.* at 1334 (quotation marks omitted).

Under plain error review, the *Farley* court held that "using 'but-for' language would have been a clearer exposition of the law," but the instruction's use of motivating factor language "d[id] not rise to the level of a plain error so fundamental as to affect the fairness of the proceedings." *Id.* (quotation marks omitted). This was because an ADA plaintiff could have more than one but-for cause for her termination, and the employer had argued for a sole-reason instruction.

The *Farley* Court explained (1) that "'[a] motiving factor' [wa]s synonymous with a 'determinative factor'" or "a factor which 'made a difference in the outcome,'" and (2) that disability must be shown to be "a determinative, rather than the sole, decision-making factor." *Id.* (quoting *McNely*, 99 F.3d at 1077).

Although *Farley* used the phrase "a motivating factor," it did so in reference to the district court's jury instructions, not in reference to the text of Title VII. *See id.* *Farley* never mentions Title VII's motivating-factor standard and does not tie the ADA's but-for standard to Title VII's lower standard.

Recent Supreme Court decisions made clear that Title VII's motivating-factor standard is distinct from, and "more forgiving" than, the but-for cause standard. *Bostock*, 140 S. Ct. at 1739-40; *see also Gross*, 557 U.S. at 174 (holding a motivating-factor standard could not apply to an ADEA claim because "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age was simply a motivating factor"); *Comcast Corp.*, 140 S. Ct. at 1017-18 (same regarding § 1981).

## B.  Akridge's Prima Facie Case

With these principles, we return to whether Akridge established the "on the basis of disability" prong of a prima facie case under the ADA. Akridge's claim that she was discriminated against based on her disability-related healthcare costs is necessarily a claim of disparate treatment. *See Akridge*, 1 F.4th at 1274 (characterizing Akridge's claim in her prior appeal as one for "disparate treatment" under the ADA). In other words, Akridge argues that Alfa treated her differently than non-disabled employees by terminating her due to her high disability-related healthcare costs.

The ADA's text "require[s] a plaintiff alleging disparate treatment to prove that [s]he was treated less favorably than a

similarly situated, non-disabled person." *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1275-76, 1278 (11th Cir. 2022) (concluding the phrase "discriminate against," as used in several federal antidiscrimination laws including the ADA and the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f), refers to differences in treatment that injure protected individuals); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216 (11th Cir. 2008) (noting in the context of a FHA claim that, "[a]s its name suggests, a disparate treatment claim requires a plaintiff to show that [s]he has actually been treated differently than similarly situated non-handicapped people").

First, Akridge presents McCaleb as a comparator. Both worked to help unprofitable agents, handled manuals, and worked with state insurance department filings. Akridge acknowledges, however, that they worked in different areas of underwriting; undisputedly, McCaleb "worked on the property/home side" of the underwriting department, while Akridge "worked on the auto side." Coshatt further testified that home underwriting was automated to a lesser extent than auto underwriting, and that McCaleb's special projects relating to home underwriting could not be automated.

Second, Akridge presents, as comparators, Roper, Williams, McInvale, Byrom, and Goray. Akridge argues that these employees worked in the underwriting department and were affected by the implementation of the Guidewire system but were demoted instead of terminated. Akridge, however, did not know these

employees' job titles, and she could not generally describe the work they performed.

On the other hand, Chancey, who was in the chain of command for these employees, testified that (1) "[w]hat [Akridge] was doing was totally different than what this team was doing," which was working on and implementing the Guidewire system and (2) Akridge's job duties with the strategic underwriting program were automated and her remaining duties absorbed by others. Coshatt also testified that Akridge's responsibilities were automated to a greater extent than these employees.

We need not decide whether these differences make these comparators insufficient because Akridge's evidence still fails to show that Alfa's legitimate, non-discriminatory reasons for her termination were pretextual. We explain why.

## C. Akridge's Evidence does not Show Pretext

As background, "[w]e have made clear that an employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022) (quotation marks omitted). In our review of an employer's proffered reasons for an adverse employment decision, we "do not sit as a super-personnel department that reexamines an entity's business decisions," and we may not "analyze whether an employer's proffered reasons are prudent or fair." *Id.* (quotation marks omitted).

Here, Alfa's decisionmakers eliminated Akridge's position to reduce business expenses because her position was no longer needed.  As the decisionmakers testified, the strategic underwriting program Akridge worked on was now automated, including the report she created, and agents and district managers themselves could now access that information over the computer.  Akridge confirmed that "[w]orking with the agents and district managers" using "data from the reports was the majority of [her] day."  The decisionmakers also testified that Akridge's workshops were meant to introduce agents to information in the strategic underwriting report, and that those workshops were no longer necessary and were replaced by increased webinars and eLearning.  Regarding Akridge's non-automated duties, Chancey testified that these responsibilities were absorbed by other people in the underwriting department who had already been performing those duties alongside Akridge.

Given Alfa's non-discriminatory reasons for her termination, Akridge must show they were pretextual.  *See Todd*, 998 F.3d at 1216.  "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021) (cleaned up).  "[T]he pretext inquiry centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside the decision maker's head."  *Todd*, 998 F.3d at 1218.

Here, Akridge's evidence fails to create a genuine factual dispute that Alfa's reasons for firing her were both false and that the true reason was her high healthcare costs. *See Ring*, 4 F.4th at 1163. Crucially, while the decisionmakers and Forrest knew of Akridge's disabilities, her evidence does not show that anyone, and certainly not the decisionmakers or Forrest, knew her specific individual healthcare costs—the basis she provides for Alfa's alleged discrimination. *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1275 (11th Cir. 2002) (recognizing "[a]n empty head means no discrimination" (quotation marks omitted)); *see also Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.").

Each of the three decisionmakers, plus Forrest and White, testified that they were unaware of Akridge's healthcare costs. White did not have access to the BCBS system and the other HR representatives to give testimony—Forrest, Dean, and Taylor— stated that they had not become aware of Akridge's healthcare costs through Alfa's access to the BCBS system.

To show pretext, Akridge relies on this evidence: (1) the decisionmakers and others at Alfa knew of her disabilities; (2) Forrest had access to her healthcare costs; (3) the 2009 BCBS document had high healthcare costs marked; (4) she was terminated instead of being transferred to a new position; (5) her COBRA insurance stopped covering her particular migraine medication nine months after her termination; (6) once, and maybe

twice, in the last two years of her employment, Alfa instructed employees to go to the doctor only when medically necessary and that medical costs affected all employees; (7) her proffered comparators were not terminated; and (8) Alfa did not produce any written documents about its decisionmaking to terminate her.

Yet viewing this record evidence in the light most favorable to her, Akridge still offers only conjecture or speculation that (1) Forrest, or someone else in Alfa's HR department, used their access to BCBS's system to view Akridge's individual healthcare costs; (2) this information was then actually given to the decisionmakers; and (3) the decisionmakers fired her based on this information. Such "[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (quotation marks omitted); *see also Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1054 (11th Cir. 2020) (holding evidence of a conversation between a decisionmaker and a senior HR official after plaintiff's protected conduct but before her termination did not rebut the decisionmaker's denial of knowledge about the protected conduct, as "[e]vidence that the HR manager 'could have told' is not the same thing as evidence that she 'did tell'").

While Akridge's brief does not mention the 2016 BCBS report, we note that report identified the individual healthcare costs of another employee with MS, but not her costs. Even this 2016 report fails to show knowledge of Akridge's healthcare costs

or to connect Akridge's healthcare costs to her firing. Moreover, the only record evidence about this 2016 report is Dean's affidavit. Dean, a benefits manager in Alfa's HR department, stated that Alfa had not requested this specific information, and BCBS supplied it in a yearly analysis in which BCBS, not Alfa, determined what to include. At most, this 2016 report reveals the unremarkable fact that BCBS could provide Alfa, a self-insured company, information about an individual employee's healthcare costs. It does not show that anyone at Alfa actually accessed Akridge's individual healthcare costs, passed them along to the decisionmakers, and that Akridge was terminated on that basis. Instead, the decisionmakers all denied knowing Akridge's healthcare costs or ever accessing them.

Akridge's evidence also does not show that Alfa's non-discriminatory reasons for her termination were false—*i.e.*, that her position was not automated, that others were not able to absorb her non-automated duties, or that Alfa did not wish to reduce business expenses. *See Ring*, 4 F.4th at 1163. The decisionmakers testified that the majority of Akridge's duties were automated and that her non-automated duties were absorbed by others, including those who already shared those duties with her. The decisionmakers explained that Akridge's trainings and workshops were no longer necessary and that her primary responsibility as coordinator of the strategic underwriting program was automated too. Alfa's interest in reducing expenses is supported by the overbudgeted development of Guidewire. Alfa's efforts to reduce expenses is evidenced by Alfa's elimination

of (1) two senior loss control representative positions in 2015, (2) three underwriting department positions in 2018 due to automation, (3) ten accounting positions since 2016, and (4) its entire real estate investment department.

In sum, even if Akridge established a prima facie case using comparators, record evidence does not create a factual issue that Alfa's non-discriminatory reasons for firing her were both false and pretext for disability discrimination.

## D. No Convincing Mosaic

Although Akridge failed to show that Alfa's reasons for her termination were false and pretextual, a "plaintiff will always survive summary judgment if [s]he presents . . . a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (second alteration in original) (quotation marks omitted); *see also Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946-47 (11th Cir. 2023). As set forth earlier, the inference to be drawn by a jury must be that the employee's disability was a but-for cause of the employer's intentional discrimination. *See Comcast Corp.*, 140 S. Ct. at 1014-15 (noting while the materials a plaintiff may rely upon to show but-for causation change as a case progresses from complaint to trial, her burden to show but-for causation "remains constant"); *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1274 (11th Cir. 2021) (stating a party "mistakenly" argued that but-for cause was "not a

precondition under the convincing mosaic model" (quotation marks omitted)).

A plaintiff's mosaic may be made up of, among other things, (1) "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn"; (2) systemically better treatment of similarly situated employees; and (3) evidence that the employer's justification is pretextual. *Lewis*, 934 F.3d at 1185. Here too, Akridge's evidence is insufficient to survive summary judgment.

Tellingly, the timing of relevant events in this case is anything but suspicious. Akridge worked at Alfa in 1993 when she was diagnosed with MS, and she stated that "in the earlier years, shots needed for MS could cost [her] insurance [as] much as $11,000 per month." Significantly, Alfa continued to employ Akridge for decades, funding the cost of her healthcare for decades too.

Similarly, Akridge draws speculation about a change in her COBRA coverage nine months after her termination. Again, if Alfa's aim was to fire Akridge to rid itself of her healthcare costs, it is hard to understand why Alfa would wait nine months—and continue to pay $10,000 to $12,000 per month or $90,000 to $108,000 total—before changing her COBRA coverage. *Cf. Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (noting that, in the context of retaliation claims, a three-to-four-month gap between protected conduct and an adverse employment action could not, standing alone, establish a causal connection).

In addition, the only potentially ambiguous statements in the record are that within the two years prior to Akridge's termination, Alfa once, or maybe twice, told employees to go to the doctor only if medically necessary and that rising healthcare costs affected the premiums of all employees. These companywide statements about rising healthcare costs and the general nature of self-insured businesses are too far removed from Akridge's firing in time and scope for a jury to infer discriminatory intent. *See Lewis*, 934 F.3d at 1185. This is especially true given the absence of any comments, ambiguous or otherwise, to Akridge or others about her healthcare costs.

Certainly, in a convincing-mosaic case, we may consider relevant evidence about similarly situated employees, even if those employees are not "strict comparator[s]" at the prima facie stage. *Jenkins v. Nell*, 26 F.4th 1243, 1250-51 (11th Cir. 2022); *see also Tynes*, 88 F.4th at 947 ("[I]t is possible that her comparators were insufficient to establish a prima facie case yet still relevant to the ultimate question of intentional discrimination."). Yet, we conclude that a reasonable jury could not infer discriminatory intent based on the fact that Akridge's proffered comparators were not terminated because (1) Akridge had different job duties; (2) her duties were automated to a greater extent; and (3) Alfa eliminated a significant number of other positions, including several in the underwriting department and the elimination of its entire real estate investment department.

As we already explained, Akridge also failed to present evidence indicating that Alfa's reasons for her firing were pretextual. At bottom, there was no genuine factual dispute that the decisionmakers did not have access to, and did not have knowledge of, Akridge's individual healthcare costs. "Evidence that [Alfa's] HR [department] 'could have told'" the decisionmakers about Akridge's healthcare costs "is not the same thing as evidence that [the HR department] 'did tell.'" *See Martin*, 959 F.3d at 1054.

In short, Akridge has failed to present evidence that "would allow a jury to infer intentional [disability] discrimination." *See Lewis*, 934 F.3d at 1185. Thus, we affirm the entry of summary judgment on Akridge's disparate-treatment claim.

## E. Reasonable Accommodation Claim

In her amended complaint, Akridge also claimed that Alfa failed to reasonably accommodate her disability. The court granted summary judgment on her reasonable-accommodation claim because she abandoned it by failing to reference or support that claim in her brief opposing summary judgment.

On appeal, Akridge presents arguments on the merits of her reasonable-accommodation claim, but she does not challenge the trial court's abandonment finding. Akridge thus has forfeited any challenge to this abandonment finding, and we decline to consider merits-based arguments she failed to raise below. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (holding a party abandons an issue by failing to raise it on appeal); *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1344 (11th Cir. 2017) ("We will not

consider arguments raised for the first time on appeal.").
Accordingly, we affirm the entry of summary judgment on
Akridge's reasonable-accommodation claim.

## V.    SANCTIONS

The court denied Akridge's motion to compel Alfa to
produce Forrest for a Rule 30(b)(6) deposition, but she does not
challenge this ruling on appeal.  Akridge contests only the court's
separate order awarding sanctions to Alfa for having to respond to
Akridge's motion about Rule 30(b)(6).

A party seeking discovery, like Akridge, may file a motion to
compel a discovery response.  FED. R. CIV. P. 37(a).  If a motion to
compel is denied, the court must award reasonable expenses to the
opposing party unless "the motion was substantially justified or
other circumstances make an award of expenses unjust."  FED. R.
CIV. P. 37(a)(5)(B).  The court found that Akridge's motion to
compel Forrest to testify as a Rule 30(b)(6) witness was not
substantially justified and awarded $1,918 in sanctions.  That $1,918
award was strictly limited to Alfa's reasonable expenses in opposing
Akridge's motion to compel Forrest's Rule 30(b)(6) deposition.  On
appeal, Akridge's challenge is to the award of any sanctions, not to
the particular amount imposed.

Akridge has shown no error or abuse of discretion in that
ruling.  First, nothing in our opinion in Akridge's prior appeal
suggested she could seek Forrest's deposition under Rule 30(b)(6).
*See Akridge*, 1 F.4th 1271.  Our opinion nowhere cites Rule 30(b)(6).
*See generally id.*  Instead, our Court explained that Forrest's roles at

Alfa and his corresponding access to information were "relevant and thus sufficient to make *his* testimony discoverable." *Id*. at 1277 (emphasis added).

Second, the text of Rule 30(b)(6) provides that "[t]he named organization," here Alfa, "must designate one or more officers, directors, or managing agents, . . . or other persons who consent to testify on its behalf." FED. R. CIV. P. 30(b)(6). Alfa's choice of White as the designated Rule 30(b)(6) representative was not challenged or at issue in the prior appeal. Akridge raised only whether Forrest could be deposed. In her reply brief in that prior appeal, Akridge confirmed that she "specifically requested, pursuant to Rule 30(a)(1), to question . . . Scott Forrest. . . . This discovery is allowed by Rule 30(a)(1), and should have been permitted by the District Court."

Under the particular procedural history of the case, Akridge's motion to compel Forrest's appearance as a Rule 30(b)(6) witness, filed after the prior appeal, was not substantially justified.

## VI.    RESPONSE TO DISSENT IN PART

One final matter. Our colleague joins our majority opinion except for its causation holding. Respectfully, as to causation, our colleague's dissent misstates our holding, and her discussion of "a motivating factor" causation rests on faulty citations and flawed analysis.

To begin, the majority opinion holds that "a plaintiff may not pursue an ADA discrimination claim by showing 'a motivating factor' causation but must show but-for causation." Maj. Op. at 24.

However, the dissent misreads our holding as requiring that an ADA claimant "must prove that her disability was <u>the</u> 'but-for' reason for an adverse employment action[.]"  Dissent Op. at 1 (emphasis added).  This is not our holding, nor could it be.

As the Supreme Court and this Court have made clear, there can be multiple but-for causes of an adverse employment action. *See Bostock*, 140 S. Ct. at 1739 ("Often, events have multiple but-for causes."); *Farley*, 197 F.3d at 1334 ("[W]e simply require that a disability be shown to be a determinative, rather than the sole, decision-making factor."); *see also Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008) ("[P]laintiffs claiming intentional discrimination under the [Rehabilitation Act ("RA")] must show that they were discriminated against '*solely* by reason of [their] disability,' but the ADA requires only the lesser 'but for' standard of causation." (citation omitted)).  Because there can be more than one but-for cause for an adverse employment action, an ADA claimant need only show that her disability was one such cause, *i.e.*, one "determinative . . . decision-making factor."  *See Farley*, 197 F.3d at 1334.

The dissent also misreads our precedent as holding "that 'but for' causation means the same thing as 'a motivating factor' causation standard."  Dissent Op. at 5 (citing *McNely*, 99 F.3d at 1073, 1076).  *McNely* never discussed motivating-factor causation.  *See generally McNely*, 99 F.3d 1068.  Instead, the *McNely* court held that the ADA imposed a "but-for" causation standard, and that an ADA claimant need not show her disability was the <u>sole</u> cause of

an adverse employment action.  *Id.* at 1073-74, 1076 ("[W]e hold that the ADA imposes liability whenever the prohibited motivation makes the difference in the employer's decision, *i.e.*, when it is a 'but-for' cause.").  *McNely*'s characterization of but-for cause under the ADA—*i.e.*, a cause that made the difference in the outcome— is consistent with how the Supreme Court in *Bostock* described but-for causation and is at odds with how it described the motivating-factor standard.

As we explained above, the Supreme Court in *Bostock* clarified that but-for causation and motivating-factor causation are distinct standards.  *See* Maj. Op. at 22 (citing *Bostock*, 140 S. Ct. at 1740).  But-for causation means that a particular cause was "outcome determinative."  *Id.*  But the motivating-factor causation standard is "more forgiving" than but-for causation, as "liability can sometimes follow even if [a protected trait] *wasn't* a but-for cause of the employer's challenged decision."  *Id.* (quoting *Bostock*, 140 S. Ct at 1740).

Second, the dissent miscites several circuits as applying a motivating-factor causation standard to ADA claims.  *See* Dissent Op. at 4-5 (citing *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 756 (8th Cir. 2016); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014); *C.G. v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013); *Katz v. City Metal Co.*, 87 F.3d 26 (1st Cir. 1996); *Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300 (8th Cir. 1995)).  However, none of these decisions are on point.

For example, in *Oehmke*, the Eighth Circuit assumed, without deciding, that motivating-factor causation applied to an ADA claim because the employer was entitled to summary judgment under either a motivating-factor or but-for causation standard. 844 F.3d at 757 n.6 ("[B]ecause we agree with the district court that Medtronic is entitled to summary judgment even under the less restrictive mixed-motive causation standard, we decline to address this important question at this time.").

The dissent's reliance on another Eighth Circuit decision, *Pedigo*, is misplaced, given that it predates *Oehmke*, the 2008 amendments to the ADA, and the Supreme Court's decisions in *Gross* and *Comcast Corporation*. *See* 60 F.3d 1300. More recently, the Eighth Circuit noted "the potential effect of *Gross* on [its] interpretation of the ADA," but has yet to decide that impact. *See Oehmke*, 844 F.3d at 757 n.6; *see also Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1002 (8th Cir. 2012) ("We have our doubts about the vitality of the pre-*Gross* [ADA] precedent.").

The Third Circuit's decision in *C.G.* also provides no support. That decision never uses the words "motivating factor." *See generally C.G.*, 734 F.3d 229. Instead, in the *C.G.* footnote our colleague cites, the Third Circuit distinguished between sole causation under the RA and but-for causation under the ADA. 734 F.3d at 236 n.11. And the Third Circuit's characterization of causation under the ADA is consistent with but-for causation, not motivating-factor causation: "The existence of an alternative cause, however, may not necessarily be fatal to an ADA claim so

long as disability played a role in the . . . decisionmaking process and . . . had *a determinative effect on the outcome* of that process." *Id.* (emphasis added) (quotation marks omitted); *see Bostock*, 140 S. Ct. at 1739 (characterizing a but-for cause as outcome determinative).

We recognize that in *Katz*, the First Circuit did characterize the causation element of an ADA claim as requiring that a claimant show her "disability was a motivating factor in [the employer's] decision to fire [her]." 87 F.3d at 33. However, the *Katz* court did not discuss but-for causation or the motivating factor language found in Title VII. *See generally id.* More importantly, *Katz* was issued before the 2008 amendments to the ADA and the Supreme Court's decision in *Gross*. And since *Katz*, the First Circuit has found *Gross* persuasive, and it characterized *Katz*'s use of "motivating factor" as "loose language" and dicta. *See Palmquist v. Shinseki*, 689 F.3d 66, 74-75 (1st Cir. 2012) (declining, in light of *Gross*, to "transplant" Title VII's motivating-factor causation standard to the RA).

That leaves only the Fifth Circuit's decision in *LHC Group*. But that case also did not discuss the motivating-factor language found in Title VII, whether but-for cause applied, or *Gross*. *See generally LHC Grp.*, 773 F.3d 688. Additionally, the dissent reads too much into *LHC Group*'s passing reference to a "motivating factor." *See id.* at 702. The Fifth Circuit describes the "motivating factor test" under the ADA as whether discrimination "play[ed] a role in the employer's decision making process" and had "a determinative influence on the outcome." *Pinkerton v. Spellings*, 529 F.3d 513,

519 (5th Cir. 2008) (quotation marks omitted). That standard is but-for causation. *See Bostock*, 140 S. Ct. at 1740.

Third, the dissent mistakenly relies on the ADA's incorporation of different Title VII provisions to support its adding "a motivating factor" language to the ADA's text. Dissent Op. at 3.

This ignores that several circuits have expressly held that while the ADA incorporates some Title VII provisions, it does not incorporate the motivating-factor causation standard found in Title VII under § 2000e-2(m). *See Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019) ("Notably absent from [the ADA's incorporation provision], however, is § 2000e-2(m)."); *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 234 (4th Cir. 2016) ("[W]hile [the ADA] incorporates Title VII's 'Enforcement provisions' in § 2000e-5, it does not incorporate the 'Unlawful employment practices' in § 2000e-2[(m)]."); *Lewis v. Humbolt Acquisition Corp.*, 681 F.3d 312, 319 (6th Cir. 2012) (en banc) ("That Congress did not incorporate § 2000e-2 into the ADA ought to give a court pause before doing so itself."); *Murray v. Mayo Clinic*, 934 F.3d 1101, 1104-07 (9th Cir. 2019) (holding the ADA did not incorporate the motivating-factor standard from Title VII); *cf. Palmquist*, 689 F.3d at 73-74 (holding the RA, which also incorporates part of Title VII, simply "borrows its remedial scheme from Title VII, but it does not borrow the [motivating-factor] causation standard set out in section 2000e-2(m). Instead, the [RA] borrows the causation standard from

the [ADA]," which has "language [that] contrasts sharply with the 'motivating factor' standard used in section 2000e-2(m).").

In addition, as explained above, these circuits held that, after the 2008 amendments to the ADA, but-for causation applies to ADA claims, even though the amendments changed "because of" to "on the basis of." *See* Maj. Op. at 21; *Natofsky*, 921 F.3d at 349; *Gentry*, 816 F.3d at 235-36; *Murray*, 934 F.3d at 1106 & n.6; *Lewis*, 681 F.3d at 315, 321.

The dissent also misses the fact that the motivating-factor standard does not apply to all Title VII claims, much less to ADA claims. The Supreme Court's decision in *Nassar* is instructive. In *Nassar*, the Supreme Court held that but-for causation, not motivating-factor causation, applies to Title VII retaliation claims. 570 U.S. at 362. Noting the structure of Title VII, the Supreme Court stated that Congress chose to place the motivating-factor language only in a section pertaining to status-based discrimination, not retaliation. *Id.* at 353. In characterizing Title VII's structure, the Supreme Court stated that, "[i]f Congress had desired to make the motivating-factor standard applicable to all Title VII claims"—and as relevant here, applicable to ADA claims through its partial incorporation of Title VII—"it could have inserted the motivating-factor provision as part of a section that applies to all such claims, such as § 2000e-5." *Id.* at 354.

Finally, the dissent relies on legislative history to support applying motivating-factor causation in ADA cases. Dissent Op. at 5-6. "But we should not, cannot, and do not use legislative history

to get around the plain meaning of a statute's text." *Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1361-62 (11th Cir. 2020) ("[I]t is better to analyze a statute than it is to psychoanalyze Congress."). Here, the plain text of the ADA requires a claimant to show that an employer made an adverse employment decision "on the basis of" her disability. 42 U.S.C. § 12112(a). Our colleague contends that "[l]ater amendments to the ADA further underscore that Congress sought to retain the 'motivating factor' causation standard." Dissent Op. at 4. Yet the 2008 amendments to the ADA did not add "motivating factor" language. Rather, the amendments changed "because of" to "on the basis of." *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 5, 122 Stat. 3553.

If Congress intended to retain, clarify, or add the motivating-factor standard to the ADA, it could have simply added that language, like it did in its 1991 amendments to Title VII. *See* Civil Rights Act of 1991, Pub. L. No. 102-166, §§ 107, 109, 105 Stat. 1071. Instead, and in direct contrast to Title VII, Congress chose to not add the motivating-factor language to the text of the ADA. We presume this choice was intentional, and we decline to add language to the ADA that Congress chose not to include. *See Gross*, 557 U.S. at 174 ("When Congress amends one statutory provision but not another, it is presumed to have acted intentionally.").

## VII.    CONCLUSION

We affirm the grant of summary judgment in favor of Alfa and the sanctions award of $1,918 against Akridge.

**AFFIRMED.**

22-12045    ABUDU, J., Concurring and Dissenting in part          1

ABUDU, Circuit Judge, concurring in part and dissenting in part:

I join in the Majority's opinion affirming the district court's grant of summary judgment in favor of Defendant Alfa Mutual Insurance Company and the sanctions award against Plaintiff Jennifer Akridge. I write separately because I disagree with the Majority's holding that a plaintiff bringing a claim pursuant to the Americans with Disabilities Act of 1990 ("ADA") and its subsequent amendments must prove that her disability was the "but for" reason for an adverse employment action as opposed to the disability being a motivating factor. The ADA's purpose and language, especially its incorporation of Title VII of the Civil Rights Act of 1964's ("Title VII") enforcement mechanism, all lead to the conclusion that the ADA forbids adverse employment decisions motivated, even in part, by a plaintiff's disability. For this reason, I respectfully dissent in part.

## I.    THE ADA's HISTORICAL BACKGROUND AND CONNECTION TO TITLE VII

As originally enacted, Title I of the ADA provided as follows:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

*See* Americans with Disabilities Act, Pub. L. 101-336, Title I, § 102, July 26, 1990, 104 Stat. 331 (codified at 42 U.S.C. § 12112(a) (1994)).

2          ABUDU, J., Concurring and Dissenting in part    22-12045

Congress enacted the ADA to correct an omission in the categories of protected classes enumerated in Title VII. 42 U.S.C. § 12101(a)(4) (explaining Congress enacted the ADA, in part, because "unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination").

In 1989, the Supreme Court decided *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which interpreted the causation standard for Title VII by defining the statutory phrase "because of." For context, Title VII states that it is unlawful for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin." *Id*. at 240 (citing 42 U.S.C. §§ 2000e-2(a)(1),(2)). In interpreting that statutory section, a plurality of the Supreme Court held that where a plaintiff proved her membership in a protected class played "a motivating part" in an adverse employment action, i.e., there were mixed motives that played into the decision, the plaintiff had established that the action was "because of" the protected class in violation of the statute. *Id*. at 250.

In response to *Price Waterhouse* and similar Supreme Court cases decided around that time, Congress amended Title VII to explicitly allow for a mixed-motive standard of causation. *See* Title VII of the Civil Rights Act of 1964, Pub. L. No. 88 352, 78 Stat. 241, as amended by the Civil Rights Act of 1991, Pub. L. No. 102 166, § 107, 105 Stat. 1071; 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party

22-12045    ABUDU, J., Concurring and Dissenting in part    3

demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice.") (emphasis added).  Congress explained its twin aims behind the amendments: (1) "to respond to recent Supreme Court decisions by restoring the civil rights protections that were dramatically limited by those decisions[;]" and (2) "to strengthen existing protections and remedies available under federal civil rights laws. . . ."  H.R. REP. NO. 102-40 at 1 (1991), *reprinted in* 1991 U.S.C.C.A.N. 694, 694.

Congress enacted the ADA shortly thereafter and crafted the statute's causation standard using the "because of" language.  *See* Americans with Disabilities Act, Pub. L. 101-336, Title I, § 102, July 26, 1990, 104 Stat. 331 (codified at 42 U.S.C. § 12112(a) (1994)).  It also incorporated by reference Title VII's "powers, remedies, and procedures" linking the two statutes.  *See* 42 U.S.C. § 12117(a).  Notably, the ADA contains no other enforcement or remedies provisions besides those explicitly incorporated from Title VII,  *see id*.; 42 U.S.C. § 2000e-5, and the Title VII remedies section specifically incorporates a plaintiff's ability to proceed under mixed-motive causation, 42 U.S.C. § 2000e-5.  This incorporation matters.  Given *Price Waterhouse*'s holding, Congress's codification of the motivating factor language, the Title VII Amendments, and the ADA linking the two statutes, it is clear that plaintiffs need not establish "but for" causation in ADA cases and must only meet the "motivating factor" test.

4          ABUDU, J., Concurring and Dissenting in part   22-12045

Later amendments to the ADA further underscore that Congress sought to retain the "motivating factor" causation standard. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 5, 122 Stat. 3553 (codified as amended at 42 U.S.C. §§ 12101-12213 (2009)) ("ADAAA"). The ADAAA reads, in relevant part, "No covered entity shall discriminate against a qualified individual *on the basis of* disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (emphasis added).

Before and after the ADAAA amendments, our sister circuits applied and continue to apply a "motivating factor" standard in ADA cases. *See, e.g., Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 756-57 (8th Cir. 2016) ("We apply a mixed-motive causation standard [to ADA claims], allowing claims based on an adverse employment action that was motivated by both permissible and impermissible factors" (citing *Pedigo v. P.A.M. Transp., Inc.*, 60 F.3d 1300, 1301 (8th Cir. 1995)); *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 702 (5th Cir. 2014) (explaining that under the ADA, "discrimination need not be the sole reason for the adverse employment decision . . . [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome") (alterations in original) (citation and internal quotation marks omitted)); *Katz v. City Metal Co.*, 87 F.3d 26, 33 (1st Cir. 1996) (explaining that the third element of a prima facie case under the ADA is to show "that [plaintiff's] disability was a motivating factor in [the employer's] decision to fire him"); *see also C.G. v. Pa. Dep't of Educ.*, 734 F.3d 229,

22-12045    ABUDU, J., Concurring and Dissenting in part        5

236 n.11 (3d Cir. 2013) (explaining that the existence of "an alternative cause" for an adverse employment action "may not necessarily be fatal to an ADA claim so long as disability 'played a role in the . . . decision[]making process and . . . had a determinative effect on the outcome of that process'" (citation omitted)).  Moreover, even though our Circuit has used the "but for" language in ADA cases with respect to causation, our application of that language has been to find in a plaintiff's favor "whenever the prohibited motivation ma[de] a difference in the employer's decision." *See McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir. 1996) ("When Congress enacted the ADA, it did so against the backdrop of recent Supreme Court employment discrimination case law that interpreted the phrase 'because of' *not* to mean 'solely because of.' We think Congress knew what it was doing . . . .").  Thus, we held that "but for" causation means the same thing as "a motivating factor" causation standard.  *Id.*

Congress amended the ADA with this tapestry in mind.  Legislative history shows that the purpose of the amendment was not to disturb the original causation standard that had been appropriately interpreted by our Circuit and other circuits, but to decrease debate about what constitutes a disability.[1]

---

[1] The bill amends Section 102 of the ADA to mirror the structure of nondiscrimination protection in Title VII of the Civil Rights Act of 1964, changing the language of Section 102(a) from prohibiting discrimination against a qualified individual 'with a disability because of the disability of such individual' to prohibiting discrimination against a qualified individual 'on the basis of disability.' This more direct

Congress passed the ADA and ADAAA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). It also intended to "provide clear, strong, consistent, and enforceable standards addressing discrimination against individuals with disabilities." *Id*. § 12101(b)(2). Strong and enforceable standards are ones that deter discrimination, not condone it. Raising the bar to a "but for" causation standard is contrary to the statute's direct link to Title VII, historical context, legislative history, and purpose. Thus, mixed-motive causation applies to ADA and ADAAA claims.

## II.    AKRIDGE'S ADA CLAIM STILL FAILS

Even under the "motivating factor" test, Akridge still has not met her burden of proving that her disability was a consideration in Alfa's decision to terminate her employment.

---

language, structured like Title VII, ensures that the emphasis in questions of disability discrimination is properly on the critical inquiry of whether a qualified person has been discriminated against on the basis of disability, and not unduly focused on the preliminary question of whether a particular person is even a 'person with a disability' with any protections under the Act at all.

H.R. Rep. No. 110-730, pt. 1, at 6 (2008); see also 154 Cong. Rec. S8840-01 (Sept. 16, 2008) (Senate Statement of Managers) (explaining that recent Supreme Court decisions had the impact of lower courts finding "that an individual's impairment did not constitute a disability" and never reaching the more salient question of whether unlawful discrimination had occurred).

22-12045    ABUDU, J., Concurring and Dissenting in part            7

Because Alfa moved for summary judgment, we review the district court's decision *de novo* and draw all reasonable inferences in Akridge's favor. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023). Under the mixed-motive framework that applies to Akridge's ADA claim, she must prove that: (1) her termination was an adverse employment action; and (2) her disability was a motivating factor in her termination. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (ruling that the *McDonnell Douglas* burden-shifting framework does not apply to mixed-motive claims). Akridge bears the burden to prove her case by a preponderance of the evidence. *Id.* at 1329. At issue here is the second prong of that framework—whether Akridge demonstrated that her multiple sclerosis and the related employer-funded healthcare costs were a motivating factor in Alfa's decision to terminate her. *See id.* She did not.

Because the evidence supports a finding that none of the decision makers were aware of her healthcare costs, she cannot rely on that as a basis for her ADA claim. Although three of the individuals who played a role in Alfa's decision to terminate her knew about her multiple sclerosis, there was no evidence showing that any of them knew about Akridge's—or any other employee's—healthcare costs. She also did not present any evidence showing or genuinely questioning whether the head of human resources had any access to her healthcare costs. Furthermore, Alfa employed Akridge for twenty-seven years, and she had multiple sclerosis for twenty-three of those years. In Akridge's own words, Alfa had no problem paying for her multiple sclerosis medications "over the

course of th[ose] years."  Given these material facts and the other evidence fleshed out in the Majority Opinion, Akridge did not meet her burden.

## III.    CONCLUSION

Congress, through the ADA's "motivating factor" standard recognized the reality that many employees with disabilities face—that an employer may have or manufacture multiple reasons to fire someone, but if one of those reasons is related to a person's disability, the employer's behavior is unlawful.  Nevertheless, Akridge's ADA claim still cannot survive.